T.C. Memo. 2012-96

UNITED STATES TAX COURT

F. LEE BAILEY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

F. LEE BAILEY AND ESTATE OF PATRICIA S. BAILEY, DECEASED,
F. LEE BAILEY, PERSONAL REPRESENTATIVE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 3080-08, 3081-08.          Filed April 2, 2012.

P, a lawyer, represented a criminal defendant who was cooperating with the Federal Government by facilitating the transfer of his foreign assets as restitution. In 1994 P entered into an unusual unwritten agreement with the Government, pursuant to which he would use an existing foreign account of his own to hold $6 million of the client's stock and make expenditures to facilitate the client's plan. P sold some of the stock and borrowed against the remainder, using some of the proceeds for the client's business but also transferring some to other accounts from which he made personal expenditures of his own. He later repaid the funds he had spent for himself.

P conducted a yacht rental activity and an airplane remanufacturing activity through a wholly owned S corporation.

Most of the use of the yacht was personal.  The airplane remanufacturing activity was devoted to developing a plane as a prototype, including the expensive process of obtaining FAA approval for remanufacturing multiple planes for sale.  Neither of the activities ever generated a profit, and P claimed pass-through losses from his S corporation on his individual income tax returns.

P failed to report all of his income on his returns, wrongly reported some income he did not receive, claimed some deductions he could not substantiate, and failed to deduct certain amounts that he did expend.

Held:  P realized income not when he received the stock, sold it, or borrowed against it, but only when he transferred sale proceeds to other accounts from which he later made personal expenditures.

Held, further, the yacht rental activity was not engaged in for profit under I.R.C. sec. 183 during any of the tax years at issue; but the airplane remanufacturing activity was engaged in for profit from 1993 until April 1996.

Held, further, for the 1993 through 1995 and 1997 through 2000 tax years, P is liable for the accuracy-related penalty under I.R.C. sec. 6662.

F. Lee Bailey, for himself.

Carina J. Campobasso, for respondent.

## CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Mr. Bailey's career and business ventures . . . . . . . . . . . . . . . . . . . . . . . . 8
    Mr. Bailey's representation of Claude Duboc . . . . . . . . . . . . . . . . . . . . . 9
    Mr. Bailey's unwritten agreement with the Government . . . . . . . . . . . . . . 9
    The terms of the unwritten agreement . . . . . . . . . . . . . . . . . . . . . . . . 10
    Payments under the unwritten agreement . . . . . . . . . . . . . . . . . . . . . . . . 12
    The use of Mr. Bailey's existing Credit Suisse account . . . . . . . . . . 14
    Mr. Bailey's work under the agreement . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Mr. Bailey's financial transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Accounting for and return of stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Repayment of unapproved expenditures and personal loans . . . . . . . . . . . 21
    Subsequent proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Mr. Bailey's subchapter S corporations . . . . . . . . . . . . . . . . . . . . . . . . 24
    Mr. Bailey's records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Mr. Bailey's airplane rental activity . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Mr. Bailey's yacht rental activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    Mr. Bailey's airplane remanufacturing activity . . . . . . . . . . . . . . . . . . . . 30
    Project 288 income and expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    Preparation of Mr. Bailey's Forms 1040 and 1120S . . . . . . . . . . . . . . . . 38
    Filing of Mr. Bailey's Forms 1040 and 1120S . . . . . . . . . . . . . . . . . . . . 39
    Mr. Bailey's cooperation with the IRS's examination . . . . . . . . . . . . . . . 45
    Destruction of records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Notices of deficiency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    I.       Background evidentiary principles . . . . . . . . . . . . . . . . . . . . . . . . 48

          A.     Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

               1.     Providing IRS access to records . . . . . . . . . . . . . . . . 49

                     a.     Taxpayers are required to keep their own records. . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

b. Taxpayers are required to retain their records as long as they may become material for tax purposes. . . . . . . . . . . . . . . . . . . . . . . . . 51

2. Burden shift under section 7491(a) . . . . . . . . . . . . . . . 52
3. Alleged animus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
4. New matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B. Collateral estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

II. Income from wrongful appropriations . . . . . . . . . . . . . . . . . . . . 60

A. Taxable income includes wrongful appropriations. . . . . . . . . 60
B. A trustee realizes income from the trust corpus when he actually misappropriates it. . . . . . . . . . . . . . . . . . . . 62
C. Mr. Bailey realized income when he transferred stock sale proceeds from the advance account. . . . . . . . . . . . 64
D. Mr. Bailey did not realize income when he transferred loan proceeds from the advance account. . . . . . . . . . . . . . . . . 66

III. Due process and Mr. Bailey's income from the Broder litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

IV. Whether activities are engaged in for profit: general principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

V. Analysis of Mr. Bailey's yacht rental activity . . . . . . . . . . . . . . . . . 80

A. Lack of profit motive for yacht refurbishing activity . . . . . . . 81

1. Manner in which the activity is conducted . . . . . . . . . . 82
2. Expertise of the taxpayer and his advisers . . . . . . . . . . 83
3. Time and effort expended . . . . . . . . . . . . . . . . . . . . . 83
4. Expectation that assets may appreciate in value . . . . . . 84
5. Taxpayer's success in similar or dissimilar activities . . . . . . . . . . . . . . . . . . . . . . . . . . 84

6-7. History of income or loss, amount of
occasional profits ........................... 84
8. Financial status of the taxpayer ................... 84
9. Elements of personal pleasure .................... 85
10. Conclusion ................................ 86

B. Equitable estoppel ................................ 87

1. Alleged agreement ........................... 87
2. Alleged misleading .......................... 88

C. Lack of nexus between yacht refurbishing and
yacht rental ................................... 90
D. Tax consequences ............................... 91

VI. Analysis of Mr. Bailey's airplane remanufacturing activity ....... 92

A. Profit motive under section 183 ...................... 92

1. Manner in which the activity is conducted .......... 92
2. Expertise of the taxpayer and his advisers .......... 94
3. Time and effort expended ...................... 95
4. Expectation that assets may appreciate in value ...... 96
5. Taxpayer's success in similar or
dissimilar activities .......................... 96
6-7. History of income or loss, amount of
occasional profits ........................... 97
8. Financial status of the taxpayer ................... 98
9. Elements of personal pleasure .................... 98
10. Conclusion ................................ 99

B. Timing of deductions ............................ 100

1. The Commissioner's alternative contention ........ 100
2. Start-up expenditures ......................... 101
3. Capital expenditures ......................... 103
4. Analysis ................................. 103

VII.   Miscellaneous adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

      A.    Mr. Bailey's position . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
      B.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

           1.    Income items . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
           2.    Deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

VIII.  Failure-to-file additions to tax under section 6651(a)(1) . . . . . . . . . 138

IX.    Accuracy-related penalty under section 6662 . . . . . . . . . . . . . . . . 139

      A.    Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
      B.    Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, <u>Judge</u>:  The Internal Revenue Service ("IRS") issued to petitioner F. Lee Bailey[1] two statutory notices of deficiency on November 6, 2007, pursuant to section 6212,[2] showing the IRS's determinations of the following

---

[1]For the years 1993 and 1994, the IRS issued a notice of deficiency to Mr. Bailey and his wife, Patricia S. Bailey, who died in 1999.  Mr. Bailey is the personal representative of the Estate of Patricia S. Bailey.  For the years 1995 through 2001, the IRS issued a notice of deficiency to Mr. Bailey alone.

[2]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code (26 U.S.C.), and all citations of Rules refer to the Tax Court Rules of Practice and Procedure.

deficiencies in income tax and failure-to-file additions to tax and accuracy-related penalties under sections 6651(a)(1) and 6662, respectively, for the 1993 through 2001 tax years:

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662 |
|---|---|---|---|
| 1993 | $176,818 | --- | $35,364 |
| 1994 | 2,137,907 | --- | 427,581 |
| 1995 | 174,217 | --- | 34,843 |
| 1996 | 511,444 | --- | --- |
| 1997 | 218,116 | --- | 43,623 |
| 1998 | 629,209 | $94,381 | 125,842 |
| 1999 | 130,758 | 19,530 | 26,152 |
| 2000 | 66,309 | 9,946 | 13,262 |
| 2001 | 82,191 | --- | --- |

The issues for decision are: (i) whether and when Mr. Bailey realized income from Biochem Pharma stock held in his investment account at Credit Suisse Bank; (ii) whether Mr. Bailey's yacht rental activity and airplane remanufacturing activity were engaged in for profit pursuant to section 183; (iii) whether and to what extent his income was fully reported or over-reported; (iv) whether and to what extent his deductions are substantiated and deductible; and (v) whether he is liable for the addition to tax under section 6651(a)(1) and the accuracy-related penalty under section 6662 for any portions of the deficiencies.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The parties' stipulations of facts are incorporated herein by this reference. At the time that he filed his petitions, Mr. Bailey resided in Massachusetts.

Mr. Bailey's career and business ventures

During the tax years at issue, Mr. Bailey was an attorney who was well known for his defense of high-stakes, high-profile criminal cases. Mr. Bailey tried cases in almost every State and in five foreign countries. He was also a speaker and author. During the years at issue Mr. Bailey's average gross income from those activities exceeded $1 million a year.

Before his graduation from law school in 1960 and his subsequent career as an attorney, Mr. Bailey served as a pilot in the U.S. Marine Corps. As a Marine he flew many types of aircraft, and he developed an interest in small airplanes.

In March 1954 Mr. Bailey received his commercial license to fly aircraft, and he began to fly small airplanes for personal pleasure and recreation. In 1960, when he began his law practice, Mr. Bailey purchased a small airplane and used it to fly himself to and from the locations of his various court cases.

In 1971 Mr. Bailey bought a helicopter manufacturing company named Enstrom Helicopter Corp. and owned it for 10 years before selling it. The record

does not show Mr. Bailey's precise role in Enstrom or the extent of the company's profitability. The record does not show that Mr. Bailey was involved in any other ventures related to remanufacturing, refurbishing, leasing, buying, or selling aircraft (or other luxury vehicles such as boats).

## Mr. Bailey's representation of Claude Duboc

In 1994 Claude Duboc, who was accused of importing marijuana into the United States on a huge scale, retained Mr. Bailey to negotiate a plea arrangement and to assist Mr. Duboc in cooperating with the Federal Government's seizure of his many foreign assets, including multiple pieces of high-value residential real estate. To influence the prosecutors and the court to reduce his sentence, Mr. Duboc wanted to maximize the amounts paid over to the Government, but the Government's seizure of his assets presented legal, diplomatic, and practical difficulties.

## Mr. Bailey's unwritten agreement with the Government

Because of those difficulties, the Government entered into a vague and unusual agreement with Mr. Bailey, under which Mr. Bailey would perform services to facilitate Mr. Duboc's forfeiture of his assets, and Mr. Duboc would transfer 602,000 shares of Biochem Pharma stock to Mr. Bailey, to provide funds that

Mr. Bailey could use to maintain and transfer Mr. Duboc's foreign assets.[3]  Thomas

Kirwin, an Assistant U.S. Attorney who worked for the Government on the Duboc

case (and who later became a U.S. Attorney) testified at trial that the Duboc case

was important and complex and that the nature of the work that Mr. Bailey

undertook to do was "extraordinary".  Nonetheless, the agreement was completely

unwritten.  Bailey v. United States, 54 Fed. Cl. 459, 465 (2002) (Bailey II).

The terms of the unwritten agreement

As described by Mr. Kirwin in his testimony in these cases, the unwritten

agreement called for Mr. Bailey to--

> liquidate the properties, maintain them, you know, worry about the
> mechanic's lien, worry about the zoning things, getting all of those

---

[3]Some of the facts pertinent to the Biochem Pharma stock issue were determined in litigation between Mr. Bailey and the Government on two prior occasions:  In United States v. Duboc, No. 94-01009 (N.D. Fla. Oct. 23, 1997), aff'd in part, rev'd and remanded in part sub nom. United States v. Bailey 175 F.3d 966, 967-968 (11th Cir. 1999) (Bailey I), a forfeiture proceeding in District Court, the Government successfully claimed the right to Mr. Duboc's 602,000 shares of Biochem Pharma stock, reduced only by expenditures approved by the district court. In Bailey v. United States, 40 Fed. Cl. 449 (1998), 46 Fed. Cl. 187 (2000), 54 Fed. Cl. 459 (2002) (Bailey II), a contract suit in the Court of Federal Claims, Mr. Bailey unsuccessfully claimed a contractual right to the appreciation in value that the Biochem Pharma stock experienced after it was transferred to his Credit Suisse account.  The parties are here collaterally estopped from disputing the facts set out in part I.B. below that were found in those prior cases.

things ready so that these houses could be sold and the money repatriated to the United States.

The asset that was to be used to cover both Mr. Bailey's fees and the other expenses generated by Mr. Bailey's work--both for Mr. Duboc's defense and for repatriation of his foreign assets--was Mr. Duboc's Biochem Pharma stock. If the stock had instead been forfeited immediately to the Government, the Government's only practical option would have been to sell it promptly; but flooding the market with that quantity of stock would have yielded diminished sale proceeds and might have damaged the company. It was therefore in the common interest of Mr. Duboc (who wanted as large a forfeiture as possible), Mr. Bailey (who wanted a source for payment of his fees[4]), and the Government (which wanted a well-managed repatriation and as large a forfeiture as possible) to leave the Biochem Pharma stock out of the Government's hands and to let Mr. Bailey manage it.

---

[4]Mr. Bailey believed that under the agreement he became entitled to any appreciation in the value of the Biochem Pharma stock, see p. 12 below; and that was an additional subjective reason for him to favor the transfer of the stock to himself. However, the Court of Federal Claims held in Bailey II that the unwritten agreement did not entitle him to the appreciation.

Therefore, under the unwritten agreement, Mr. Bailey was to hold the Biochem Pharma stock in trust for the Government,[5] and he was to have the discretion to sell the stock or to borrow against it as he saw fit.

Mr. Bailey was at risk that, if the Biochem Pharma stock depreciated, there would be no source from which to pay his attorney's fees. He maintained that, on the other hand, he was entitled to any appreciation in the value of the Biochem Pharma stock; but the Court of Federal Claims held to the contrary in Bailey II, and that holding estops any dispute of the matter here. Under the agreement Mr. Bailey was not entitled to the Biochem Pharma stock's appreciation. However, Mr. Bailey's contrary belief conditioned some of his decisions in managing the repatriation, as we will show below. In particular, expecting appreciation in value, he often borrowed against the stock when funds were needed, rather than selling it; and, in addition to using the stock as collateral, he assumed personal liability for the loans.

Payments under the unwritten agreement

The repatriation expenses that were incurred under the agreement (including property maintenance expenses and Mr. Bailey's travel expenses) could be

_____

[5]The parties are collaterally estopped from disputing this finding of the District Court. See pt. I.B.2. below.

reimbursed as incurred. The defense expenses would include costs (other than attorney's fees) that defense counsel would incur on the case, and those defense costs could be reimbursed to counsel as incurred. The defense expenses would also include attorney's fees for Mr. Bailey and the other attorneys working with him, Bailey II, 54 Fed. Cl. at 463-466, 491, 492, 505, 506, 508, which the Government personnel acknowledged might amount to as much as $3 million, id. at 463, but there was confusion about the permissible timing of the payment of attorney's fees. Mr. Bailey thought that the agreement allowed him to withdraw fees as earned (subject to making a subsequent accounting to the court),[6] but the Government personnel did not agree to such a provision; and the U.S. District Court for the Northern District of Florida eventually held that Mr. Bailey did not have this right (and that some of his withdrawals had therefore been improper).

The Government and Mr. Bailey were both clear that, at the conclusion of the criminal case, Mr. Bailey would make an accounting to the District Court. See, e.g., Bailey II, 54 Fed. Cl. at 468, 492. The Court of Federal Claims found, see id. at 468, that Mr. Bailey explicitly acknowledged in 1994, at the conference

---

[6]See Bailey II, 54 Fed. Cl. at 468 ("Mr. Bailey and * * * [his co-counsel] agreed that under the arrangement they could take fees as they were necessary or earned").

between counsel and the court in which the Biochem Pharma arrangement was approved, that Mr. Bailey--

> would account for the $6 million value of the stock transferred to him, and present an application for payment of fees to Chief Judge Paul at the end of the case and not on an interim basis, although Mr. Bailey and * * * [his co-counsel] agreed that under the arrangement they could take fees as they were necessary or earned.

The use of Mr. Bailey's existing Credit Suisse account

Mr. Bailey had an investment account at Credit Suisse in which he held investments, and he had a linked account (called an "advance account") into which cash from transactions involving those investments was deposited and from which expenditures or cash transfers could be made. In 1994 Mr. Bailey's own funds totaling $53,397 were in the advance account, apart from the Biochem Pharma transfers.

For receiving and holding the Biochem Pharma stock, Mr. Bailey did not open a new account. Rather, the "Government attorneys understood that Mr. Bailey possessed * * * a Swiss bank account", Bailey II, 54 Fed. Cl. at 464, and by agreement it was Mr. Bailey's own account at Credit Suisse that was used for the Biochem Pharma transactions, id. at 486, 505.

On April 26, 1994, 602,000 shares of Biochem Pharma stock, then worth $5,891,352, were transferred to Mr. Bailey's Credit Suisse account. Mr. Bailey

did not report income from his receipt of that stock on any income tax return for any year.

Mr. Bailey's work under the agreement

From April 1994 until late 1995, Mr. Bailey worked very intensively on the Duboc matter. He made frequent trips to Europe, maintained and sold Mr. Duboc's properties, paid European creditors with claims against the properties, dealt with complications of foreign law, negotiated with foreign prosecutors and customs officials who had their own interest in Mr. Duboc's assets, dealt with a French magistrate who froze certain of the assets, did most of the work in a joint effort with Government counsel to obtain a necessary order from the District Court, and visited regularly with Mr. Duboc in a prison in the rural United States. Mr. Kirwin acknowledged that Mr. Bailey's work on the repatriation of Mr. Duboc's assets was very good; and the Court of Federal Claims found that his work was "far more than usual for a defense attorney". Bailey II, 54 Fed. Cl. at 484.

Mr. Bailey's financial transactions

In 1994 and 1995, Duboc-derived funds came into the Credit Suisse advance account from three sources--(1) sales of Biochem Pharma stock, (2) loans collateralized by Biochem Pharma stock, and (3) sales of other stock owned by Mr. Duboc. First, Mr. Bailey made two sales of Biochem Pharma stock in his Credit Suisse account: In October 1994 he sold 150,000 shares for $1,550,850; and in April 1995 he sold 52,000 shares for $850,005. The two sales thus yielded total proceeds of $2,400,855. Second, in 1994 and 1995 Mr. Bailey borrowed a total of $3,013,463[7] from Credit Suisse against the remaining 400,000 shares. Mr. Bailey was personally liable for the loans, but he used the Biochem Pharma shares as collateral. Third, at the request of the U.S. Marshals overseeing the forfeiture, Mr. Bailey received and sold $730,000 worth of other stock owned by Mr. Duboc

---

[7]By eliminating the stock sale proceeds, the Commissioner concludes that the remainder of the transferred funds were borrowings and amounted to $550,041 in 1994 and $2,500,230 in 1995, totaling $3,050,271. Mr. Bailey objects to this analysis only by asserting that "[t]he fees of two other clients were deposited in the Credit Suisse account during 1994 (as the records show) and were included in the transfers as earned". We infer that the "records" must be Exhibit 5-J (Credit Suisse statements) and that the two non-Duboc deposits are for $17,169.96 on October 28 and $19,637.63 on December 21, totaling $36,807.59. We accept the Commissioner's analysis subject to that correction, so that the 1994 loans were $513,233 and the two-year total was $3,013,463. Because we find that loan proceeds are not income to Mr. Bailey, the precise amounts of the loans are not necessary to our decision.

(in Obayashi Corp. and Pasco Corp.), to facilitate the forfeiture of the proceeds.

From the Duboc-derived proceeds in the Credit Suisse advance account (i.e., sale proceeds of $2,400,855 plus loan proceeds of $3,013,463, totaling $5,414,318), Mr. Bailey both made expenditures for the benefit of Mr. Duboc and for the repatriation of his assets (hereinafter, "Duboc-related expenditures") and made transfers to his money market account at Barnett Bank (hereinafter, "the Barnett account"); and from the Barnett account he both made Duboc-related expenditures and made transfers to his personal checking account. These cascading transactions were as follows:

From the Credit Suisse advance account, Mr. Bailey made Duboc-related expenditures[8] that totaled $931,698 in 1994 and $302,454 in 1995; and he made transfers of Biochem Pharma stock sale and loan proceeds to the Barnett account totaling $688,270[9] in 1994 and $2,750,249 in 1995 (totaling $3,475,327), of which

_____

[8]From this account Mr. Bailey also made a $57,487 personal purchase of stock. This stock purchase was apparently made from Mr. Bailey's own money in the account, which, according to Arthur Andersen, consisted of an opening balance of $5,526 and non-Duboc-related deposits of $49,006 and $17,170.

[9]The parties stipulated that the 1994 transfers from the Credit Suisse account to the Barnett account totaled $725,078. Of this amount, $688,270 was from Duboc-derived funds, and the remaining $36,808 was from fees paid by other

(continued...)

the sale proceeds constituted $175,037 in 1994 and $250,019 in 1995 (totaling $425,056) and loan proceeds constituted the remainder of $3,013,463.[10] Mr. Bailey also transferred from the Credit Suisse account to the Barnett account the $730,000 in proceeds from the sales of the Obayashi and Pasco stock.

From the Barnett account, Mr. Bailey paid $730,000 in 1995 to the U.S. Marshals, for the Obayashi and Pasco stock. (The record shows no complaint at that time from the U.S. Marshals that this $730,000 payment was made from the Barnett account rather than directly from the Credit Suisse advance account, and we find that his use of this account did not result in any appropriation by Mr. Bailey.) Mr. Bailey also made transfers from the Barnett account to his personal checking account totaling $2,863,000 in 1995 (including the $425,056 that constituted Biochem Pharma sale proceeds, rather than loan proceeds). From the Barnett account Mr. Bailey also made substantial personal expenditures, both in 1994 and 1995, but they were evidently made from his non-Duboc-related personal

---

[9](...continued)
clients.

[10]These expenditures and transfers of Biochem Pharma-derived funds from the Credit Suisse advance account total only $4,672,671, whereas the gross totals of Biochem Pharma-derived funds credited to the Credit Suisse advance account (from sales and loans) was $5,414,318. The difference of $741,647 apparently consists of amounts paid back to Credit Suisse from time to time during 1994 and 1995.

funds in the account, which were adequate to cover those expenditures. The record does not show that Mr. Bailey regarded the funds in the Barnett account as subject to any restrictions on their use resulting from his agreement with the Federal Government.

From the personal checking account (which had received $2,863,000 of Duboc-derived funds from the Barnett account in 1995 (including the $425,056 in sales proceeds)), Mr. Bailey made $35,705 in Duboc-related expenditures, apparently in 1995. He spent the remainder of the Duboc-derived funds (more than $2.8 million) on non-Duboc-related matters. When the money was in that personal checking account, Mr. Bailey treated it (and spent it) as his own.

Accounting for and return of stock

In late 1995 or early 1996, Mr. Duboc replaced Mr. Bailey with another lawyer. For the prior year and a half, the Government had not inquired about the Biochem Pharma stock. However, Mr. Duboc's retention of new counsel focused attention on the situation at a time when the stock had more than quadrupled in value (from under $10 per share in the spring of 1994 to about $44 in February 1996). The 400,000 unsold shares had thus increased in value by about $34 per share, so that appreciation of $13.6 million was at stake. At the Government's request, the District Court ordered Mr. Bailey to transfer the

400,000 unsold Biochem Pharma shares to the Federal Government. At that time, however, Mr. Bailey owed $2,332,743 for loans that had been made against 236,000 of the remaining 400,000 unsold shares (and he had spent the proceeds); and Credit Suisse would not make any transfer of the shares until the loans were repaid. Mr. Bailey therefore did not immediately comply with the District Court's order, and the court found him in contempt in March 1996 and ordered him incarcerated.

Mr. Bailey had induced Credit Suisse to transfer 164,000 of the unsold shares to the Federal Government in February 1996. However, because the remaining 236,000 of those unsold shares served as collateral for the loans of about $2.3 million, Mr. Bailey had to repay those loans before Credit Suisse would transfer those shares to the Government. He did repay the Credit Suisse loans (from funds he borrowed from others); but the difficulty of borrowing such amounts from third parties (accomplished while Mr. Bailey was incarcerated for contempt) accounted for his delay in complying with the District Court's order. After Mr. Bailey repaid the Credit Suisse loans, Credit Suisse transferred the remaining 236,000 shares to the Government in April 1996. See Bailey I, 175 F.3d at 968.

Repayment of unapproved expenditures and personal loans

Having thus paid off the Credit Suisse loans, Mr. Bailey then had to account to the District Court for (and make up the balance of) the $2,400,855 in proceeds of his sales of 202,000 shares in 1994 and 1995. "The district court determined that Bailey incurred $1,221,177.06[11] in legitimate, reimbursable expenses," Bailey I, 175 F.3d at 968, apparently leaving $1,179,678 that the court ordered him to repay.

Of that amount, $700,000 was repaid in April 1997. That $700,000 payment was from an amount due to Mr. Bailey in unrelated litigation he had against Aaron J. Broder. Pursuant to court order, Mr. Broder paid that amount to trustees who had been appointed by the District Court in the Duboc case, toward Mr. Bailey's obligations in that case. In 1998 the remainder of the Broder lawsuit was settled for $1,100,000 (in addition to the $700,000 paid in 1997); however, $829,639.01 of that $1,100,000 in settlement payments from Mr. Broder was paid not to Mr. Bailey himself but to third parties.[12] Specifically, $150,000 of the

_____

[11]As we have found, Mr. Bailey had paid Duboc-related expenses from the Biochem Pharma proceeds totaling $1,269,857 (i.e., from the advance account, $931,698 in 1994 and $302,454 in 1995; and from the personal checking account, $35,705 in 1995).

[12]The $1,100,000 in settlement payments from Mr. Broder consisted of (i) a $100,000 check to Michael Armstrong for legal fees, (ii) a $485,000 check to Wayne Smith for loan repayment, (iii) a $50,000 check to Fishman, Ankner &
(continued...)

$829,639.01 was paid to Mr. Bailey's attorneys for legal fees, which the Commissioner concedes is deductible under section 162, and the remaining $679,639.01 was paid to Mr. Bailey's creditors, who had lent to Mr. Bailey in April 1996 to enable him to pay off the Credit Suisse loans and obtain release of the 236,000 shares of Biochem Pharma stock. Mr. Bailey did not include, in the income he reported on his tax returns, the payments totaling $1,650,000[13] that Mr. Broder made to him or to his creditors on his behalf in 1997 and 1998.

The $700,000 payment from Mr. Broder in April 1997 left a balance of $479,678 of disapproved expenditures that Mr. Bailey was required to repay. Two and a half years later, the unpaid balance was only $423,237.77, so that the difference--$56,440--was evidently paid sometime before then. Since the record

---

[12](...continued)
Horstmann for legal fees, (iv) a $270,360.99 check to Mr. Bailey, and a wire transfer of $194,639.01 to Truman Bank for loan repayment, totaling $465,000.

[13]In his response to a request for admissions, Mr. Bailey admitted that he did not include the $700,000 payment from Mr. Broder to the trustees, the $485,000 payment from Mr. Broder to Mr. Smith, and the $194,639.01 payment from Mr. Broder to Truman Bank in the income he reported on his tax returns. In that response, Mr. Bailey denied that he failed to include the $270,360.99 payment from Mr. Broder to himself. However, the IRS included that amount as unreported income for 1998 in the notice of deficiency, and Mr. Bailey had the burden to prove that he reported that amount on his tax returns. Since Mr. Bailey failed to do so, we find that he did not include any of the $1,650,000 in the income he reported on his tax returns.

does not show exactly when, and Mr. Bailey has the burden of proof, we assume that a $56,440 payment was made in 1999 and not earlier.  Mr. Bailey repaid the remaining balance of $423,237.77 by two additional payments in late 1999.

Subsequent proceedings

As a result of his handling of the Duboc matter and the Biochem Pharma stock, Mr. Bailey was disbarred.[14]

Notwithstanding the District Court's orders, Mr. Bailey still claimed that he was entitled to the Biochem Pharma stock appreciation that had occurred after April 1994, but in Bailey II the Court of Federal Claims rejected that claim.  As a result, Mr. Bailey was left with none of the proceeds of the Biochem Pharma stock. He was reimbursed only for the portion of his out-of-pocket expenditures that the District Court approved, and he was not paid any fee for his services.

Nonetheless, the IRS issued a notice of deficiency on November 6, 2007, in which it determined, inter alia, that Mr. Bailey received income of $5.9 million

---

[14]The court orders concerning Mr. Bailey's disbarment are, of course, public records.  See In re Bailey, 2005 WL 2901885 (D. Mass. Nov. 1, 2005), aff'd, 450 F.3d 71 (1st Cir. 2006); Florida Bar v. Bailey, 803 So.2d 683 (2001); In re Bailey, 786 N.E.2d 337 (Mass. 2003).  However, the Commissioner did not attempt to bind Mr. Bailey to any findings reflected therein, and we do not derive facts from them nor attempt to reconcile our findings with them.

when the Biochem Pharma stock was transferred in 1994 to Mr. Bailey's Credit Suisse account.

Mr. Bailey's subchapter S corporations

During the tax years at issue, Mr. Bailey was the sole owner of a subchapter S corporation known as Palm Beach Roamer, Inc. (PBR). During 1993 and part of 1994, Mr. Bailey was also the sole owner of an S corporation known as Bahamas Enterprises, Inc. (BEI). Through these S corporations Mr. Bailey conducted three activities--yacht rental, airplane rental, and airplane refurbishing. Mr. Bailey admits that none of these activities ever turned a profit. We discuss those activities in detail below and explain here the corporate structure.

In 1993 BEI held title to a number of small airplanes, which Mr. Bailey rented to the general public. In 1994 Mr. Bailey merged BEI into PBR and renamed it Roamer Aircraft Division for accounting purposes. After the merger, Mr. Bailey sold off most of the small airplanes and ceased to rent airplanes to the general public.

Mr. Bailey incorporated PBR in 1987. PBR was a calendar year taxpayer and used the accrual method of accounting. PBR purchased and refurbished a yacht, which PBR chartered from 1993 to 1996 and sold in 1998.

In 1993 Mr. Bailey decided to use PBR to remanufacture airplanes rather than yachts. In 1994 PBR purchased a used airplane and began the airplane remanufacturing activity, which continued until 1996.

In sum, through BEI and PBR Mr. Bailey was engaged in three distinct activities:[15] the airplane rental activity (through BEI from 1993, until he merged BEI into PBR in 1994); the yacht rental activity (through PBR from 1993 to 1996), and the airplane remanufacturing activity (through PBR from 1994 to 1996).

Mr. Bailey's records

The record does not show the type or quality of the records that Mr. Bailey kept for BEI and PBR (or the three activities that he conducted through them). Mr. Bailey initially stored all of his records for BEI and PBR at his law offices in Palm Beach, Florida. In 2000 he moved those records to an airplane hangar at the Palm Beach County Park Airport in Lantana, Florida ("the Lantana hangar"), which he had used for the conduct of the airplane rental and manufacturing activities. (As we explain below, these records were destroyed sometime after June 2002.)

---

[15]See note 42 below.

Mr. Bailey used "Quicken" software to maintain registers for his several personal and business accounts and to generate various summaries and reports of the information in those registers. Using this software, he or his staff entered deposits and expenditures, coded according to source or category, and various reports could thereafter be printed out using these data. Our record includes Quicken printouts of registers and summaries for three of the years (1996, 1999, and 2000), and the data they show appear to correspond generally to the amounts reported on Mr. Bailey's returns for those years.

Mr. Bailey's airplane rental activity

Mr. Bailey rented small airplanes to the general public through BEI during 1993 and part of 1994--an activity the IRS contends was not engaged in for profit. Mr. Bailey generally stored those airplanes in the Lantana hangar. After Mr. Bailey merged BEI into PBR in 1994, he sold off most of the small airplanes and ceased the rental activity. On his returns for 1993 and 1994, Mr. Bailey reported losses from this activity. On audit, the only portions of the claimed losses that the IRS disallowed were for expenses of $6,425 in 1993 and $3,850 in 1994 that cannot be substantiated.

<u>Mr. Bailey's yacht rental activity</u>

In 1989 PBR purchased a used Chriscraft Roamer yacht from a bank in Rhode Island. Mr. Bailey christened the yacht the <u>Spellbound</u>, and PBR refurbished it, with the services of Dennison Marine (a yacht manufacturing company and a client of his law practice) and the Roscioli Yachting Center. Mr. Bailey hoped to use the <u>Spellbound</u> as a prototype to refurbish and sell other used yachts, but at trial he did not prove how serious that hope was, nor how critical it was to his purchase and refurbishing of the yacht. During the refurbishing process, the <u>Spellbound</u>'s plumbing, electronics, and heating and air-conditioning systems were all replaced. With the help of Ann Dennison, a decorator at Dennison Marine, Mr. Bailey personally redesigned the interior layout of the <u>Spellbound</u>. He fitted the yacht with new carpeting, wall coverings, and furniture. When the <u>Spellbound</u> was fully refurbished (before the years at issue), it was built to Mr. Bailey's specifications, and he considered it beautiful.

In 1993 Congress repealed the luxury tax (which had applied to new yachts, and not refurbished yachts),[16] and Mr. Bailey concluded that the price advantage

---

[16]<u>See</u> Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, sec. 13161, 107 Stat. at 449 (repealing the luxury tax on the first retail sale of boats). Mr. Bailey testified that the luxury tax was important to his idea of selling refurbished used yachts. He said he began the venture believing that the

(continued...)

of used yachts over new yachts was now insufficient for his yacht refurbishing activity to be profitable. He therefore abandoned his idea of refurbishing and reselling used yachts (and decided to use PBR as a vehicle to remanufacture and sell used airplanes, as is discussed below).[17] Although running a yacht rental business had not ever been one of PBR's objectives, and although Mr. Bailey had no expertise in yacht rental, he decided to rent the Spellbound to help to cover the cost of its dockage fees until he sold it.

Mr. Bailey did not expect that the Spellbound would appreciate in value but believed on the contrary that yachts generally depreciate very quickly.

---

[16](...continued)
10 percent tax that was imposed by section 4002 on sales of new yachts would work to his advantage by increasing the prices of new yachts as compared to used yachts, but that the repeal frustrated his original plan. However, the tax was enacted in 1990, after he purchased the Spellbound. See Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, sec. 11221(a), 104 Stat. at 1388-438 (imposing a 10% luxury tax, effective January 1, 1991, on the first retail sale of passenger vehicles, boats, aircraft, and furs and jewelry). His trial testimony was sincere but evidently mistaken about this almost 20-year-old sequence.

[17]Despite the fact that PBR exited the yacht refurbishing business in 1993 and never intended to enter the yacht rental business, it purchased a 22-foot ski boat in 1995, which Mr. Bailey christened the Glacier Bay. Mr. Bailey kept the Glacier Bay docked at his personal residence, and concedes that the principal use of PBR's ski boat was personal.

Mr. Bailey did not personally expend any time or effort in renting the Spellbound. Instead, PBR hired Jim Hunter and his wife, Cynthia Walsh, to sail and maintain the Spellbound as its captain and crew. From 1993 to 1996, PBR sporadically chartered the Spellbound to members of the general public, but most of the use of the Spellbound was by Mr. Bailey's family and friends.

Mr. Bailey's summaries of the revenue and expenses for the yacht rental activity indicate that the activity generated 10 times more expenses than charter fees. We conclude that the activity consistently generated losses and that Mr. Bailey's nonbusiness use of the Spellbound exceeded the rental use.

The crew of the Spellbound kept timesheets for 1995,[18] and those timesheets show that in that year the crew devoted only 106.5 hours to paid charters but devoted 320 hours to personal trips. The timesheets also show that the Spellbound was used for business reasons on only 34 days but was used for personal or unpaid trips on 71 days. Most of the use of the Spellbound was personal during the tax years at issue.

Other than the few records discussed here, Mr. Bailey failed to offer into evidence any logs, books, records, business plans, profit analyses, or market

---

[18]The record does not include any copies of timesheets kept by the crew of the Spellbound for other years.

studies with respect to the yacht rental activity. Mr. Bailey testified that he kept, in the Lantana hangar, logs and other records for PBR that would have demonstrated a profit objective and would have substantiated the business use of the Spellbound in his rental activity; but as is discussed below, Mr. Bailey discarded those records after he stopped renting the Lantana hangar in June 2002.

The yacht rental activity ended in April 1996. Mr. Bailey was incarcerated for contempt on March 6, 1996, and remained in prison for 44 days. Shortly thereafter, the Government took control of the Spellbound as a condition of Mr. Bailey's release. In April 1996 PBR dismissed the captain and crew and ceased to charter the Spellbound. PBR sold the Spellbound in March 1998.

PBR received modest amounts of gross income from the yacht rental activity (reported as $5,707 in 1993, $7,364 in 1994, $56,396 in 1995, $68,998 in 1996) and $39,449 of capital gain in 1994 from the sale of an airplane (presumably obtained from BEI); but the activity turned no profit. We need not verify the precise amounts of the yacht-related expenses to know that they swamped the yacht-related income in every year.

Mr. Bailey's airplane remanufacturing activity

In 1993 Mr. Bailey decided to use PBR as a vehicle to remanufacture and sell used airplanes. Mr. Bailey determined to purchase, repair, and modify used

airplanes, and then to sell them at about half the price of comparable new airplanes. Mr. Bailey planned first to remanufacture a single airplane as a prototype and then to remanufacture and sell other used airplanes.

Mr. Bailey considered two similar airplane models--the Piper PA-30 Twin Comanche and the Beechcraft Baron--for PBR to modify and resell. Piper Aircraft's production of the Twin Comanche had ceased in 1972, whereas Beechcraft's production of the Baron was ongoing. Mr. Bailey ultimately chose the Twin Comanche over the Beechcraft Baron after consulting with Robert A. Hoover, an air show and test pilot; Charles B. Cusick, an aeronautical engineer and former executive with Narco (an avionics manufacturer for small aircraft) and Cessna Aircraft Co.; and LeRoy Patrick LoPresti, an aeronautical engineer and former executive with Beechcraft and Piper Aircraft, Inc. All three men favored Piper's Twin Comanche and advised against remanufacturing Beechcraft's Baron--an airplane model that was still in production--since to do so would involve direct competition with a major manufacturer and might prompt the manufacturer to pressure suppliers into denying him good prices on the parts that he would need to remanufacture the used planes. Piper's Twin Comanche was also favored because (i) it was readily available in large numbers on the secondary market, (ii) it was originally manufactured with a zinc chromate coating on both the inside and outside

of the hull to prevent corrosion, and (iii) it was a relatively fuel-efficient airplane at a time when fuel prices were rising.

In 1994 PBR purchased a used Twin Comanche and began the airplane remanufacturing activity. The plane he purchased had the serial number 30-288, and Mr. Bailey therefore dubbed his remanufacturing activity "Project 288". PBR also purchased two more used Twin Comanches between the years 1994 and 1996. All three of the airplanes were stored at the Lantana hangar.

Project 288 principally consisted of repairing and modifying one of the three used Twin Comanches for use as a prototype, which Mr. Bailey dubbed the "Bailey Bullet". The activity also involved (i) obtaining approval from the Federal Aviation Administration (FAA) to modify the Twin Comanche for resale; and (ii) promoting the sale of PBR's line of modified Twin Comanches by displaying the Bailey Bullet at trade shows and meetings for aviation enthusiasts.

During the remanufacturing process, PBR disassembled the airframe, engines, and moving parts of the Bailey Bullet and reconstructed it using a number of new and reconditioned parts. The Bailey Bullet was cleaned, repainted, and reconstructed with a new interior, new upholstery, and new engines. When the process was complete, the Bailey Bullet was equipped with all of the most up-to-date features, and Mr. Bailey considered it "better than new".

Mr. Bailey, as the sole owner and president of PBR, personally chose the features that were added to the Bailey Bullet. However, PBR hired about a dozen employees to disassemble and reconstruct the airplanes. Mr. Bailey's son, Scott Bailey, served as the vice president of PBR and was the highest paid employee in Project 288. After interviewing with Scott Bailey, Douglas Vasco was hired as the chief inspector and director of maintenance for Project 288 in May 1995. During the tax years at issue, Mr. Vasco was an FAA-certified designated airworthiness representative. In that capacity he was authorized to perform examination, inspection, and testing services for Project 288 that were necessary in order to obtain FAA permission to modify Twin Comanches. See 14 C.F.R. sec. 183.33 (1996). During his tenure at PBR, Mr. Vasco had about nine employees working under him in Project 288, two of which were FAA-certified airframe and powerplant mechanics.

In addition to PBR's employees, Project 288 contracted for the services of Bill Wall. Mr. Wall wore two hats with respect to Project 288. During the tax years at issue, Mr. Wall served as the president of East Coast Aerospace, an aircraft engineering company. In that capacity, he helped to develop modifications to the Twin Comanche design and install those modifications on the Bailey Bullet. Mr. Wall also served as the administrator of East Coast Avionics, an FAA-

certified designated alteration station. In that capacity, he was authorized to issue

supplemental type certificates on behalf of the FAA to approve modifications to

aircraft designs.[19] See id. sec. 21.451. On September 21, 1995, Mr. Wall issued to

PBR five supplemental type certificates that approved a number of the

modifications that he helped to develop for Project 288. The approved

modifications to the Twin Comanche design included the conversion of its 14-volt

electrical system to a 28-volt electrical system with dual alternators, as well as the

installation of various avionics systems and engine instruments, an instrument panel,

and a heating and air-conditioning system. As Mr. Bailey's expert witness, John

---

[19]The FAA is charged by Congress with promoting air safety. See 49 U.S.C. sec. 106(g)(1)(A) (1994). When the FAA approves an aircraft design, the FAA issues a type certificate. See id. sec. 44704(a). Modifications to an FAA-approved aircraft design must also be FAA approved. Id. The FAA may issue a field approval to approve a minor modification to one serial numbered aircraft, see FAA Order 8900.1 (2009), or a supplemental type certificate to approve a modification to an aircraft design, see 14 C.F.R. sec. 21.113 (1995). As Mr. Vasco testified, the process for obtaining a "multi-use" supplemental type certificate to modify an aircraft design is considerably more difficult and expensive than obtaining a "one-off" field approval to modify a single aircraft.

Whiting Olcott,[20] credibly testified, obtaining a supplemental type certificate is a sophisticated and costly process that hobbyists do not engage in.

By 1995 the Bailey Bullet was fully remanufactured and airworthy. In that year, PBR rented booth space at the Annual Meeting and Convention of the National Business Aviation Association ("NBAA")--a civil aviation trade show--to display the Bailey Bullet. Mr. Olcott, who was the president of the NBAA at the time and presided over the convention, testified that the NBAA rented booth space only to commercial venders--never to hobbyists. He also testified that at the convention the Bailey Bullet generated "a lot of interest" from serious aviators. We find that by this time--1995--Project 288 was an active trade or business.

Despite the positive reception of the Bailey Bullet at the NBAA convention, the airplane remanufacturing activity ended abruptly in April 1996, as we have explained. Mr. Bailey was incarcerated for contempt on March 6, 1996, and

---

[20]Mr. Olcott currently serves as president of General Aero Co., Inc., a business aviation consulting firm. From 1992 to 2003, he served as president of the National Business Aircraft Association, a trade organization for corporate aviation. From 1973 to 1992, he served as an editor for two aviation magazines--FLYING and Business & Commercial Aviation--published by Ziff Davis Publishing Co. From 1974 to 1986, Mr. Olcott served on advisory committees for the National Aeronautics and Space Administration. He is a licensed transport pilot and holds a bachelor's and a master's degree in aeronautical engineering from Princeton University and a master's degree in business administration from Rutgers University.

remained in prison for 44 days until he was able to raise over $2 million to comply with the District Court's order to return the remaining shares of Biochem Pharma stock. While he was in prison, Mr. Bailey had his son, Scott Bailey, call Mr. Vasco to tell him that Project 288 was being shut down indefinitely. In response, Mr. Vasco left Project 288 in April 1996. By the time that Mr. Bailey raised the money to comply with the District Court's order and was released from prison, he had no funding to continue the airplane remanufacturing activity and all of his employees, with the exception of his son, had left Project 288. Mr. Bailey's son was on PBR's payroll until the end of 1996.

Beginning in 1996 PBR tried to sell its one remanufactured plane, the Bailey Bullet. However, PBR had mortgaged the Bailey Bullet "right to the hilt" (over $400,000) to raise money for Project 288, and it was unable to sell the remanufactured airplane for a high enough price to satisfy the mortgagor. In the absence of better evidence, we use this to conclude that Mr. Bailey's cost basis in the Bailey Bullet was $400,000. At some point after the tax years at issue, PBR was dissolved and Mr. Bailey became the direct owner of the Bailey Bullet. Although at the time of trial the Bailey Bullet was still subject to the mortgage, the mortgagor had yet to foreclose, and Mr. Bailey remained in possession of the airplane.

The Bailey Bullet was the only used Twin Comanche that Project 288 fully remanufactured. In 1996 PBR sold the two other Twin Comanches that Project 288 had purchased and had begun to disassemble.

When beginning Project 288 Mr. Bailey had no expectation that the Bailey Bullet or the other used Twin Comanches held by PBR would appreciate. However, Mr. Bailey did expect the "multi-use" supplemental type certificates that Mr. Wall issued on behalf of the FAA to appreciate, since they were in effect the licenses that would permit PBR to install in Twin Comanches the modifications permitted by those certificates, which PBR would sell in increasing numbers as he promoted the Bailey Bullet (for example, at events like the NBAA convention).

Mr. Bailey failed to submit into evidence any logs, books, records, business plans, profit analyses, or market studies with respect to the airplane remanufacturing activity. When Mr. Bailey discontinued rental of the Lantana hangar, he discarded any records there that might have demonstrated a profit objective.

Project 288 income and expenses

PBR never realized any ordinary income from Project 288, although it did realize capital gain of $59,203 in 1996 from the sale of two airplanes. PBR's

expenses incurred in connection with Project 288 totaled $424,787 in 1994,[21] $456,286 in 1995, and $125,694 in 1996.  Approximately $339,814 of PBR's expenses were for the building of the Bailey Bullet prototype,[22] presumably about half in 1994 and half in 1995.

Preparation of Mr. Bailey's Forms 1040 and 1120S

Mr. Bailey hired Mary C. Dunay, a certified public accountant, to prepare his Forms 1040, U.S. Individual Income Tax Return, for 1993, 1994, and 1995. Mr. Bailey filed joint returns with his wife for 1993 and 1994 and filed separate returns for the other years at issue.  Mr. Bailey self-prepared his Forms 1040 for 1996 through 2000.  Then Mr. Bailey hired Richard Paladino, an attorney, to prepare his Form 1040 for 2001.  The record does not show whether Mr. Bailey or

[21]For 1994, when both the yacht activity and the airplane remanufacturing activity were underway, PBR's reported cost of goods sold ($427,166) and deductions ($200,657) totaled $627,823, of which the yacht-related expenses totaled $203,036, leaving the difference--$424,787--attributable to Project 288.

[22]PBR purchased three Twin Comanches in 1994; and if we assume that PBR's entire increase in capital in that year ($180,599) is allocated among the three planes that PBR acquired, then $60,186 was the capital cost of acquiring the plane that PBR then remanufactured.  The remainder of the Bailey Bullet's $400,000 presumed cost and value (i.e., $400,000 - $60,186 = $339,814) was therefore incurred by PBR in 1994 and 1995 (i.e., $169,907 in each year). The imprecision of these assumptions is obvious; but as we explain below, the Commissioner has the burden of proof on alternative contentions for which the amounts attributable to the plane itself are relevant, and in the absence of such proof we therefore make assumptions favorable to Mr. Bailey.

anyone else prepared a Form 1120S, U.S. Income Tax Return for an S Corporation, for BEI for either 1993 or 1994. Mr. Bailey prepared the Forms 1120S for PBR for 1993 through 1998 with help from his daughter-in-law, Lainey Bailey. Mr. Bailey hired Mr. Paladino to prepare the Form 1120S for PBR for 1999. No one prepared a Form 1120S for PBR for 2000 or 2001.

Printouts of reports from Mr. Bailey's "Quicken" database were evidently used for preparing the income tax returns at issue, but our record includes contemporaneous printouts for only three years, 1996, 1999, and 2000.

In August 1998 Mrs. Bailey was diagnosed with pancreatic cancer. In July 1999 Mrs. Bailey was hospitalized and required Mr. Bailey's almost constant presence at her bedside. Mrs. Bailey died on September 9, 1999, a month after the 1998 return was due (on an extension to August 15, 1999). Mr. Bailey filed the return 50 days after Mrs. Bailey's death on October 19, 1999.

Filing of Mr. Bailey's Forms 1040 and 1120S

On the dates given in the table below, Mr. Bailey and his S corporations filed their required returns,[23] the IRS commenced examination on those returns; and the IRS issued notices of deficiency.

_____

[23]The record does not show whether BEI filed a Form 1120S for 1993 or 1994, but it does show that PBR failed to file Forms 1120S for 2000 and 2001.

| Year | Form | Filing date | Notice of deficiency |
|------|------|-------------|----------------------|
| 1993 | 1040 | Oct. 17, 1994 | Nov. 6, 2007 |
|      | 1120S (PBR) | Undated | |
| 1994 | 1040 | Oct. 15, 1995 | Nov. 6, 2007 |
|      | 1120S (PBR) | Sept. 15, 1995 | |
| 1995 | 1040 | Oct. 21, 1996 | Nov. 6, 2007 |
|      | 1120S (PBR) | Oct. 13, 1996 | |
| 1996 | 1040 | Oct. 22, 1997 | Nov. 6, 2007 |
|      | 1120S (PBR) | Sept. 15, 1997 | |
| 1997 | 1040 | Oct. 16, 1998 | Nov. 6, 2007 |
|      | 1120S (PBR) | Sept. 15, 1998 | |
| 1998 | 1040 | Oct. 19, 1999 | Nov. 6, 2007 |
|      | 1120S (PBR) | Undated | |
| 1999 | 1040 | Oct. 16, 2000 | Nov. 6, 2007 |
|      | 1120S (PBR) | Oct. 19, 2001 | |
| 2000 | 1040 | Oct. 22, 2001 | Nov. 6, 2007 |
| 2001 | 1040 | Oct. 22, 2002 | Nov. 6, 2007 |

For the nine years at issue (1993 through 2001) Mr. Bailey reported income and losses from his law practice and related speaking services on Schedule C, Profit or Loss From Business, of his Forms 1040. His reported gross income for the nine-year period was $10.1 million, and his reported expenses were

$9.5 million. For four years he reported net income and in five years net loss. On Schedules E, "Supplemental Income and Loss", attached to those Forms 1040, Mr. Bailey claimed net losses from BEI and PBR.

We find as follows concerning Mr. Bailey's reporting of specific items of income he had received and deductions he had claimed.[24] In the years at issue, Mr. Bailey received the following additional items of income (not discussed above) that were not reported on his tax returns:

| Year | Item | Amount |
|------|------|--------|
| 1993 | Barnett Bank interest income | $207 |
|      | Pension income | 1,951 |
| 1994 | Fees deposited to Credit Suisse | 86,808 |
| 1995 | Deposits to office account | 3,955 |
|      | California State income tax refund | 1,469 |
|      | Interest from three sources | 389 |
| 1996 | Mathematical error | 100,000 |
|      | Speaking income | 15,700 |
|      | Boston fees | 58,374 |
| 1997 | Deposits to office account | 33,696 |
|      | Fees from client McCorkle | 26,713 |
| 1998 | Fees from client Vidu | 7,280 |
|      | Speech income | 20,000 |
|      | Fees from client McCorkle | 110,000 |

---

[24]These miscellaneous items are discussed in part VII below.

| | | |
|---|---|---:|
| | Deposits to office account | 9,257 |
| | Payment from Phoenix | 11,288 |
| 1999 | Wages from Entertainment Partners | 1,541 |
| | Interest from Principle Life | 61 |
| 2000 | Fees from client Dubey | 63,473 |
| | Deposits to office account | 7,526 |
| | Royalty income | 26,500 |
| | Deposits to N. Bailey's account | 38,333 |
| 2001 | Unexplained items | 16,561 |
| | Pension income | 69,527 |
| | Pass-through income from Tel-Share | 2,423 |

(We do not sustain the following adjustments for additional income that were included in the IRS's notice of deficiency: $10,183 of barter income in 1995; $106,758 of checks returned to Credit Suisse in 1995; and royalty income of $20,000 in 1999.)

Mr. Bailey did <u>not</u> receive the following items of income that were mistakenly reported on his tax returns:

| <u>Year</u> | <u>Item</u> | <u>Amount</u> |
|---|---|---|
| 1995 | Reimbursed income | $1,300 |
| | Twice-included income | 40,394 |
| 1996 | Three adjustments by IRS | 23,017 |

For the years at issue, Mr. Bailey claimed on his tax returns deductions for the following items that he did not substantiate or to which he was otherwise not entitled:

| Year | Item | Amount |
|------|------|--------|
| 1993 | Dues and publications | $13,383 |
| | Legal and accounting fees (Sch. C) | 2,750 |
| | Telephone expense | 1,558 |
| | Travel expense (Tel-Share) | 3,447 |
| | Meals & entertainment | 1,161 |
| | Travel expenses | 12,976 |
| | Flow-through loss from BEI | 6,425 |
| | Charitable deduction (Aventura) | 1,000 |
| | | |
| 1994 | Dues and publications | 10,200 |
| | Legal and accounting fees (Sch. C) | 2,289 |
| | Office expense (computers) | 5,457 |
| | Office expenses (billed but not paid) | 3,322 |
| | Flow-through loss from BEI | 3,850 |
| | | |
| 1995 | Contract labor | 1,974 |
| | Credit Suisse interest | 5,741 |
| | Double-deducted expenses | 215,612 |
| | Travel & entertainment | 48,199 |
| | | |
| 1996 | Boston office expense | 202,082 |
| | Travel & entertainment | 22,080 |
| | Mortgage interest | 14,244 |
| | Real estate taxes | 2,362 |
| | | |
| 1997 | Household maintenance | 24,000 |
| | Travel & entertainment | 20,480 |
| | Office expense | 206,484 |
| | Mortgage interest | 14,986 |

|  | Real estate taxes | 11,327 |
| --- | --- | --- |
| 1998 | Travel & entertainment | 45,201 |
|  | Office expense | 579,098 |
| 1999 | Travel & entertainment | 25,229 |
|  | Office expense | 533,191 |
| 2000 | Travel & entertainment | 23,408 |
|  | Office expense | 30,519 |
|  | Nine miscellaneous items | 133,421 |
| 2001 | Household expenses | 735 |
|  | Life insurance premiums | 19,660 |
|  | Payment to attorney | 1,150 |

Mr. Bailey substantiated the following deductions that were disallowed in the notice of deficiency: $15,852 to Republic Bank in 1995; a greater portion of the office expense in 1996; and hangar expenses of $5,751 and $19,469 in 2001.

Mr. Bailey is entitled to the following additional deductions that he did not claim on his returns:

| Year | Item | Amount |
| --- | --- | --- |
| 1993 | Tax preparation (Sch. A) | $2,750 |
| 1994 | Computer depreciation | 273 |
|  | Tax preparation (Sch. A) | 2,250 |
|  | Charitable contribution | 10,000 |
| 1995 | Computer depreciation | 1,091 |
| 1996 | Computer depreciation | 1,091 |

| 1997 | Computer depreciation | 1,091 |
| 1998 | Computer depreciation | 818 |

Mr. Bailey's cooperation with the IRS's examination

The IRS opened examinations of Mr. Bailey's Forms 1040 for 1993 in December 1994, for 1994 in February 1996, for 1995 in December 1996, and thereafter for 1996 through 2001.

In 1996 the IRS assigned Revenue Agent James J. Tabor to conduct the examination of Mr. Bailey's tax returns. Beginning in May 1997, Revenue Agent Tabor partnered with Revenue Agent Bobbie Kay Campbell to issue to PBR a series of at least 29 information document requests (IDRs) with respect to the airplane rental activity, the yacht rental activity, and the airplane remanufacturing activity. The latest of these IDRs is dated April 5, 2002. The IDRs request, inter alia, (i) records to substantiate PBR's gross income and expenses; (ii) a breakdown of the expenses for the airplane rental activity, yacht rental activity, and airplane remanufacturing activity; (iii) copies of any ads purchased by PBR to promote the sale or rental of boats or airplanes; (iv) PBR's bank records; (v) market studies or records that indicate the airplane remanufacturing activity was "economically viable"; (vi) records to show the projected sales price of the airplanes and "per plane profit" in the airplane remanufacturing activity; and (vii) "[a]ny records not

previously provided that show efforts made to increase profitability of Palm Beach Roamers' businesses". The last five IDRs in the record, dated April 5, 2002, made requests with respect to the "profitability" of Mr. Bailey's activities. Those same IDRs gave Mr. Bailey until May 6, 2002, to respond.

The record includes five letters from Mr. Bailey's counsel, Mr. Paladino, to Revenue Agent Tabor, which appear to respond to a number of IDRs that are not in the record. The record also includes a "breakdown" of the revenue and expenses of PBR's three activities for 1995 and 1996; it is addressed from Lainey Bailey to Revenue Agent Tabor in response to "IDR #19". Mr. Bailey failed to fully comply with the IDRs, and he repeatedly failed to provide the IRS with requested information.

In 2002 Mr. Bailey's representative did provide printouts of his Quicken reports for 1996, 1999, and 2000 to the IRS's examining agent and of workpapers generated during the preparation of the returns. The agent did a painstaking analysis of the data Mr. Bailey provided, correlated them to the tax returns as filed, and identified income items and deductions not reported on the returns. The audit adjustments reflected in the notice of deficiency (described below) are largely based on that analysis.

Destruction of records

By 2002 the cost of renting the Lantana hangar became burdensome to Mr. Bailey. He notified the IRS that he would discard his records for BEI and PBR when he stopped renting the Lantana hangar, and he invited the IRS's representatives to visit the hangar and make copies of his records. Revenue Agents Tabor and Campbell and their supervisor visited the hangar and met with Mr. Bailey and his attorney, Richard Paladino, on June 24, 2002. The record does not show what records, if any, the IRS reviewed or copied. At some point thereafter, Mr. Bailey discarded his records at the Lantana hangar.

Notices of deficiency

In the notices of deficiency,[25] the IRS (i) determined that Mr. Bailey had numerous items of unreported income from his law practice and speaking services, (ii) determined to disallow some, but not all, of Mr. Bailey's deductions for his

---

[25]By stipulation and on brief, both parties have resolved several of the issues raised in the notices of deficiency. Mr. Bailey concedes that he had additional interest income of $207 under section 61(a)(4) from Barnett Bank of Palm Beach County in 1993. The Commissioner concedes that Mr. Bailey is entitled to an additional depreciation deduction under section 167 in the amount of $273 in 1994 with respect to the cost of two computers. The Commissioner also concedes the adjustment to Mr. Bailey's 1996 Form 1040 with respect to a $365,000 malpractice insurance policy payment made by the Home Insurance Co. on his behalf. Although this payment is includible in income under section 61(a), the Commissioner agrees that Mr. Bailey is entitled to a corresponding deduction in the same amount pursuant to section 162(a).

expenses from those businesses, (iii) largely disallowed the net losses from BEI and PBR that Mr. Bailey claimed on his Forms 1040, and (iv) made numerous other miscellaneous adjustments to Mr. Bailey's reported income and deductions on his Forms 1040 for the 1993 through 2001 tax years.[26]

OPINION

## I.      Background evidentiary principles

### A.      Burden of Proof

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer generally bears the burden of proving the determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deduction claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Mr. Bailey makes three attempts to shift the overall burden of proof to the Commissioner.  Each of these attempts is unsuccessful, but we do find that the Commissioner bears the burden of proof in one respect.

---

[26]During trial and on brief the parties collectively referred to the miscellaneous adjustments as "Issue C" or "the 'C' issues".

### 1. Providing IRS access to records

Mr. Bailey stored all of his records for BEI and PBR in the Lantana hangar where he conducted the airplane rental and remanufacturing activities. The record does not show the type or quality of those records. Mr. Bailey testified and contended on brief that those records could have substantiated his profit motive for all three activities.

Mr. Bailey notified the IRS that he would discard his records after he lost access to the Lantana hangar, and he invited its representatives to visit the hangar to review and copy his records. Revenue Agents Tabor and Campbell, and their supervisor, visited the hangar on June 24, 2002, but the record does not show what records, if any, they reviewed or copied. At some point thereafter, Mr. Bailey discarded his records at the Lantana hangar.

Mr. Bailey now protests that his lack of records is the IRS's fault, because it should have copied his records or should have warned him, before he discarded his records, that he might need them. His contention is not well founded.

### a.     Taxpayers are required to keep their own records.

Even assuming arguendo that the Lantana hangar once contained sufficient records to substantiate Mr. Bailey's expenses and profit motive,[27] his attempt to shift the burden of proof on this basis must fail.  The record-keeping requirements for the income tax are set forth in section 6001, which requires that--

> Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. * * * [Emphasis added.]

Taxpayers are thus required to keep sufficient records to substantiate their gross income, deductions, credits, and other tax attributes.  See also 26 C.F.R. sec. 1.6001-1(a), Income Tax Regs.  There is no provision in section 6001 or the regulations thereunder that imposes a record-keeping requirement on the IRS or that allows a taxpayer, like Mr. Bailey, to obligate the IRS to store his records.  The fact that he offered to let the IRS review and copy his records before discarding them does not absolve him of that requirement or shift the burden of proof in these cases.

---

[27]The record does not show the type or quality of records that Mr. Bailey kept in the hangar, and the Commissioner disputes Mr. Bailey's contention that those records were sufficient to substantiate his profit motive.

b. <u>Taxpayers are required to retain their records as long as they may become material for tax purposes</u>.

Even assuming arguendo that before the date on which he discarded his records, the IRS gave Mr. Bailey no indication that it would challenge his profit motive,[28] that supposed lack of notice did not shift the burden of proof. There is no provision in section 6001 or the regulations thereunder that excuses taxpayers from retaining their records if the IRS fails to notify them of an imminent challenge. Instead, taxpayers are required to retain their books and records as long as they may <u>become</u> material:

> (e) Retention of records.--The <u>books or records</u> required by this section shall be kept at all times available for inspection by authorized internal revenue officers or employees, and <u>shall be retained so long as the contents thereof may become material in the administration of any internal revenue law</u>. [Emphasis added.]

26 C.F.R. sec. 1.6001-1(e), Income Tax Regs. A taxpayer's books and records for a given tax year "may become material" for purposes of section 6001 as long as the period of limitations on assessment for that year remains open under section 6501. Since the period of limitations is still open with respect to the tax

---

[28]The record contradicts Mr. Bailey's contention that he was given no notice that the IRS might challenge his profit motive. Revenue Agent Tabor issued five IDRs to Mr. Bailey in April 2002 that each made requests with respect to the profitability of his activities--well before June 2002, when Mr. Bailey gave the IRS a final opportunity to review and copy his records before he discarded them.

years at issue,[29] Mr. Bailey was required to retain his books and records with respect to those years, whether or not the IRS gave Mr. Bailey notice of a possible challenge to his profit motive.

### 2. Burden shift under section 7491(a)

Under certain circumstances, the burden of proof as to factual matters may shift pursuant to section 7491(a) from the taxpayer to the Commissioner, but only if the taxpayer introduces credible evidence regarding a factual matter affecting his liability and only if he has complied with substantiation requirements, has maintained all required records, and has cooperated with the IRS's reasonable requests. Sec. 7491(a)(1) and (2). Mr. Bailey contends that section 7491(a) shifts the burden of proof to the Commissioner.

However, in general Mr. Bailey has not introduced credible evidence raising factual questions about his liabilities (rather, he has made conclusory arguments without supporting references to exhibits in the record); he did not comply with substantiation or record-keeping requirements (rather, he discarded his records);

---

[29]The period of limitations for assessment was open with respect to all seven of the tax years at issue on November 6, 2007, when the IRS issued the notices of deficiency to Mr. Bailey, because he signed Forms 872, Consent to Extend the Time to Assess Tax, by which he agreed to extend the period of limitations on assessment. See sec. 6501(c)(4). The period of limitations for assessment will remain open for a minimum of 60 days after the decision of this Court becomes final. See secs. 6213(a), 6503(a).

and he did not fully cooperate with the IRS, specifically with Revenue Agent Tabor's requests for information about BEI and PBR (rather, it appears that Mr. Bailey was unresponsive to a series of IDRs). Accordingly, section 7491(a) does not shift the burden to the Commissioner, and Mr. Bailey therefore retains the burden of proof with respect to the deficiencies. See Rule 142(a)(1).

3.      Alleged animus

Another contention that Mr. Bailey makes to assail the notice of determination is a recurring observation that the agent's notes (on which the notices of deficiency are based) include erasures. Mr. Bailey perceives that in 2001, after the judge in Bailey II made remarks encouraging to Mr. Bailey, the IRS agent's "investigation took a hard reversal in direction. Friendly communication stopped, and [the IRS] Agent * * * started changing his notes to favor the government." From this timing, and from erasures and revisions in the revenue agent's workpapers, Mr. Bailey infers that the prosecutors influenced the revenue agent. Mr. Bailey speculates that these erasures reflect changes that occurred after developments adverse to the Government in their litigation concerning the Duboc stock. Mr. Bailey believes that the agent made these changes not because of his bona fide conclusions about Mr. Bailey's income and deductions but cynically at the behest of the Government's attorneys. For issues as to which the agent's notes

include erasures, Mr. Bailey implicitly contends that the burden of proof should shift to the Government.

However, Mr. Bailey's only evidence to support this timeline and this scenario is his own perception of a change in the agent's attitude. The agent contradicted Mr. Bailey's contention and testified that he was "not in communication with other branches of the government". We found him credible. Having observed the agent's testimony, including under cross-examination by Mr. Bailey, we find no basis for Mr. Bailey's speculation.

Moreover, the issue of the Biochem Pharma stock (the subject of Mr. Bailey's litigation with the Government) has little relation to this argument of Mr. Bailey's, even if the argument were well grounded. The agent's notes pertain principally to substantiation issues, whereas the Biochem Pharma issue was conspicuous and well known apart from anything the agent might have done, and the parties have stipulated or broadly agreed about the basic facts of the stock transfers, loans, and expenditures that are pertinent to that issue.

But even if there were reason (there is none, we stress) to be suspicious about the agent's sincerity in the adjustments he made, such suspicion would not affect the burden of proof. As a general rule, we do not look behind the notice to examine the motives of the IRS in making its adjustments to a taxpayer's liability.

Graham v. Commissioner, 82 T.C. 299 (1984), aff'd, 770 F.2d 381 (3d Cir. 1985).
This is not an instance in which the taxpayer alleges that he was selected for audit
on the basis of an impermissible criterion, such as ethnicity, see Greenberg's
Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974), or that the statutory notice
is based on illegally seized evidence, see Suarez v. Commissioner, 58 T.C. 792,
813-814 (1972), overruled in part, Guzzetta v. Commissioner, 78 T.C. 173, 184
(1974).  To the extent that the IRS's adjustments are supported not by reason or
evidence but only by ill motive, then the taxpayer's burden to prove his actual
liability "should be concomitantly easier", cf. Church of Spiritual Tech. v. United
States, 20 Cl. Ct. 762, 765 (1990), so that the IRS's motive for the adjustments is
unimportant.

4.    New matters

The notice of deficiency disallowed Mr. Bailey's deduction of expenses
attributable to Project 288 on the ground that the activity was not engaged in for
profit.  We have found, however, that the activity was engaged in for profit.  The
Commissioner contends in the alternative that the expenditures either were start-up
expenses under section 195 or were expenditures for the creation of a capital asset
(i.e., the Bailey Bullet).   However, as an exception to the general rule,
Rule 142(a)(1) provides that "in respect of any new matter * * * pleaded in the

answer,[30] it [the burden of proof] shall be upon the respondent." The Commissioner's two alternative contentions are "new matter[s]", and the Commissioner therefore has the burden of proving that substantiated Project 288 expenditures were capital expenses or start-up expenses.

B.     Collateral estoppel

In connection with the Biochem Pharma stock issue, the Court previously advised the parties, in an order dated March 26, 2009, "that the Court will consider sua sponte (see Monahan v. Commissioner, 109 T.C. 235, 250 (1997)) the preclusive effect of those prior decisions"--i.e., Bailey I and Bailey II.  The rule of collateral estoppel provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."  1 Restatement, Judgments 2d, sec. 27 (1982); see also Allen v. McCurry, 449 U.S. 90, 94 (1980) ("Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a

---

[30]Although these alternative contentions were not pleaded in the Commissioner's answer, they were addressed at trial without objection by Mr. Bailey and were therefore tried by consent.  We therefore treat them as pleaded and do not require the Commissioner to file a motion to amend his answer, which motion we would grant.

different cause of action"); <u>Montana v. United States</u>, 440 U.S. 147, 153-154 (1979). The nature and terms of Mr. Bailey's agreement with the Federal Government were "actually litigated" by Mr. Bailey and the Federal Government in those prior cases, in which cases the issues were "essential to the judgment". <u>See</u> 1 Restatement, <u>supra</u>, sec. 27. Consequently, the findings of those prior cases are "conclusive" in these subsequent cases, though these cases are founded on a "different claim" (i.e., assignment of error in the IRS's determination of deficiencies).

Mr. Bailey objects to the application of collateral estoppel here, although it is not completely clear why he does so. This Court has no jurisdiction to award Mr. Bailey the attorney's fees for his representation of Mr. Duboc that the District Court denied him, nor to hold that he is entitled to the Biochem Pharma stock's appreciation that the Court of Federal Claims denied him. One reason that Mr. Bailey resists collateral estoppel is to make the contentions discussed in part III below (i.e., that a denial of due process in the District Court should undo his liability for tax on income that the court seized), but we show there that his due process contentions are unavailing. Moreover, the findings that we import here by way of collateral estoppel--e.g., that Mr. Bailey received the stock in trust (rather than as payment)--are largely favorable to Mr. Bailey.

In any event, Mr. Bailey's objection to the application of collateral estoppel--in particular, his contention that the issue of whether he held the Biochem Pharma stock "in trust" was not fully and fairly litigated in the prior proceedings--is not well founded.  Mr. Bailey's claims about his ownership of the stock were the focus of the litigation in Bailey I, in which the District Court issued an order of January 12, 1996, that directed Mr. Bailey to make a--

> full accounting of the monies and properties held in trust by him for the
> United States.  * * *  This should include * * * a full accounting of the
> 602,000 shares of stock in Biochem Pharma, Inc., that was delivered to
> Bailey to be held in trust for the United States.  [Emphasis added.]

Order of Contempt (Feb. 3, 1996) at 1.  In addressing Mr. Bailey's appeal from the decision of the District Court, the Court of Appeals for the Eleventh Circuit observed:

> At one time, Bailey contested ownership of the Biochem Pharma stock.
> He argued that the government had given him the stock in fee simple
> and not in trust.  Bailey dismissed that claim in May 1996.

Bailey I, 175 F.3d at 967.  Thus, Mr. Bailey's dispute of the trust character of his stock holding was decided by the District Court and was not overturned on appeal.  There can thus be no doubt that the issue was litigated.

However, Mr. Bailey evidently contends that the issue was not fully and fairly litigated because of defects in the District Court proceedings--chiefly, that

the trial judge had prejudged Mr. Bailey's claims, and Mr. Bailey "was never able to remove him from the case". This complaint about the judge was raised (as it must have been) on appeal from the judge's ruling. If the Court of Appeals erred in that regard, Mr. Bailey's remedy was to petition for a writ of certiorari from the Supreme Court, not to attack the decision collaterally in this Court.

The Court of Federal Claims did later entertain in Bailey II Mr. Bailey's dispute on the trust issue, but only long enough to determine that it was only a "semantic" dispute, since the Government contended that Mr. Bailey held the Biochem Pharma stock "in trust", 54 Fed. Cl. at 466, 471, 500, while Mr. Bailey contended that the arrangement was "in the nature of a trust", id. at 472, 501. This semantic dispute--"trust" vs. "in the nature of a trust"--is not material in these cases.

Since Bailey I clearly held at least that the Biochem Pharma stock when transferred to Mr. Bailey was for specific uses for which he must give an accounting, and Bailey II held that Mr. Bailey was not entitled to the subsequent appreciation, the parties are precluded from relitigating those issues here, and we find that Mr. Bailey held the Biochem Pharma stock not on his own account but for others.

II.     Income from wrongful appropriations

The IRS determined that Mr. Bailey received $5.9 million in income in 1994

when his client Claude Duboc transferred Biochem Pharma stock to Mr. Bailey's

investment account at a Swiss bank.[31]  Mr. Bailey contends, on the other hand, that

none of the $5.9 million was ever income to him, since he eventually had to transfer

the stock and its proceeds to the Federal Government.

A.     Taxable income includes wrongful appropriations.

Under section 61(a), "gross income means all income from whatever source

derived".  Money received may be income even when the recipient has no right to

it--even when the recipient misappropriated it--and is obliged to pay it back.  The

Supreme Court "has given a liberal construction to the broad phraseology of the

'gross income' definition statutes in recognition of the intention of Congress to tax

all gains except those specifically exempted." James v. United States, 366 U.S.

213, 219 (1961) (citing Commissioner v. Jacobson, 336 U.S. 28, 49 (1949), and

Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87-91 (1934)).  In James,

---

[31]The IRS determined that the $5.9 million was income in 1994 when
Mr. Bailey received the stock and allowed subsequent deductions for his
reimbursement of sale proceeds and his return of the unsold stock.  Since Mr. Bailey
fully reimbursed and repaid those amounts, the Commissioner acknowledges that his
income in 1994 is fully offset by deductions in later years; but under the
Commissioner's approach Mr. Bailey still may be liable for interest, additions to
tax, and penalties for tax year 1994.

366 U.S. at 219-220, the Supreme Court held that "wrongful appropriations" are includible in gross income. For that reason, Mr. Bailey's principal position--that he realized no income from the stock simply because he was eventually required to return it--must be rejected. It does not carry the day for Mr. Bailey to prove (as he easily can, in light of Bailey I and Bailey II) that he never truly owned the beneficial interest in the stock. Rather, amounts that were misappropriated and then later returned can nonetheless be taxable income in the year of the misappropriation if the taxpayer had dominion and control over those amounts. The Supreme Court has defined gross income under section 61 "to encompass all 'accessions to wealth, clearly realized, and over which the taxpayers have complete dominion.'" James, 366 U.S. at 219 (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)). In James, the Supreme Court applied this standard to conclude that "wrongful appropriations" (but not "loans") are "within the broad sweep of 'gross income'". Id.

The Commissioner's principal position here, in reliance on those principles, is that Mr. Bailey received income of $5.9 million when the Biochem Pharma stock was first transferred to his Credit Suisse investment account in 1994, pointing out that Mr. Bailey had complete dominion and control over the stock at that time. If Mr. Bailey had prevailed in Bailey I (or maybe even in Bailey II),

then the Commissioner's position would have much to commend it; but in light of the holdings in those opinions, that position, too, must be rejected. Given that the Government proved that the stock was <u>not</u> Mr. Bailey's and that he held it only in trust--and especially given that the Government persuaded the District Court to jail Mr. Bailey until he lived up to the terms of that trust--the Commissioner's principal position is not tenable.[32]

B.      <u>A trustee realizes income from the trust corpus when he actually misappropriates it</u>.

Not every remittance of funds is income to the recipient. Bank deposits are not income to the bank; a bailment is not income to the bailee; and funds received in trust by a trustee are excludible from gross income when those funds are subject to a restriction that they be expended for a specific purpose, and the taxpayer does not profit, gain, or benefit in spending the funds for the stated purpose. <u>Ford Dealers Adver. Fund, Inc. v. Commissioner</u>, 55 T.C. 761, 771 (1971) (citing <u>Seven-Up Co. v. Commissioner</u>, 14 T.C. 965 (1950), <u>aff'd</u>, 456 F.2d 255 (5th Cir.

---

[32]Because the IRS treated the receipt of the $5.9 million of stock as income, it allowed, in subsequent years, deductions for the return of the stock and the reimbursement of the sale proceeds. To the extent we hold that Mr. Bailey did not realize income from the Biochem Pharma stock, the corresponding deductions are not allowable and the adjustments therefor in the notice of deficiency must be reversed. However, under section 1341 Mr. Bailey may deduct his repayment of amounts of Biochem Pharma stock <u>sale</u> proceeds that we conclude were income to Mr. Bailey.

1972), <u>Broad. Measurement Bureau, Inc. v. Commissioner</u>, 16 T.C. 988 (1951),

<u>Angelus Funeral Home v. Commissioner</u>, 47 T.C. 391 (1967), <u>aff'd</u>, 407 F.2d 210

(9th Cir. 1969), and <u>Dri-Powr Distrib. Ass'n Trust v. Commissioner</u>, 54 T.C. 460

(1970)).  On the other hand, it is true that funds held in trust by a trustee do become

includible in his gross income once he has misappropriated them.  <u>Webb v. IRS</u>, 15

F.3d 203, 207 (1st Cir. 1994); <u>Adams v. Commissioner</u>, T.C. Memo. 1970-104

(1970).

The question whether income has been misappropriated in a given instance

is a question of fact.  <u>See, e.g.</u>, <u>BancInsure, Inc. v. BNC Nat'l Bank, N.A.</u>, 263

F.3d 766, 771 (8th Cir. 2001) ("'where an individual's conduct falls somewhere

between the two extremes of embezzlement and simple poor judgment, intent

becomes a question of fact'") (quoting <u>FDIC v. Oldenburg</u>, 34 F.3d 1529, 1540

(10th Cir. 1994)); <u>United States v. Wallace</u>, 300 F.2d 525, 532 (4th Cir. 1962)

("Whether funds were embezzled is a question of fact").  The mere fact that

Mr. Bailey had dominion and control over the Biochem Pharma stock--to such an

extent that he had discretion to sell it--does not compel the conclusion that it was

income to him, since "[d]iscretion to sell stock is consistent with a requirement for a

full accounting", <u>Bailey II</u>, 54 Fed. Cl. at 495, and therefore consistent with the

fiduciary arrangement. As a result, facts beyond "dominion and control" must be consulted.

C.   Mr. Bailey realized income when he transferred stock sale proceeds from the advance account.

If a fiduciary commingles trust funds with his own money (as Mr. Bailey did in the Credit Suisse accounts, the Barnett account, and the personal checking account), then in certain circumstances this fact would suggest that he had abandoned his fiduciary role, was now treating and using the funds as his own, and therefore realized income. However, in these cases the commingling cannot be decisive of the point. Mr. Bailey's agreement with the Government explicitly contemplated that he would use his existing Credit Suisse account for the Biochem Pharma stock. Consequently, the transfer of the shares to his Credit Suisse investment account and of the loan and sale proceeds to his Credit Suisse advance account did not constitute an appropriation of those proceeds. The relatively small personal expenditures he made from that advance account (to purchase other stock for himself) were in amounts consistent with the amounts of his own funds that were already in that advance account; and when the Government asked that he use his existing account for the Biochem Pharma stock, such commingling was made

inevitable and did not affect the trust character of the funds placed there for the repatriation and legal defense expenditures.

In 1995 Mr. Bailey transferred funds from the Credit Suisse advance account to two other accounts of his--the Barnett money market account and the personal checking account. The Government had not agreed that he should use these accounts, and from these accounts Mr. Bailey made substantial personal expenditures totaling $2.8 million. The use of the Barnett money market account was arguably consistent with the trust character of the funds, since (a) the Government may have implicitly approved the use of the account by acquiescing to its use for the repatriation of the proceeds from the Pasco and Obayashi stock (whereas there is no basis for suggesting that the Government acquiesced in his putting the funds in his personal checking account), and (b) from the Barnett account Mr. Bailey's personal expenditures were covered by his personal funds in the account (whereas from the personal checking account he made substantial personal expenditures from Biochem Pharma-derived proceeds). For those reasons, our prior order dated April 29, 2009, found that a genuine issue of material fact precluded the resolution of this point on summary judgment. At trial, however, Mr. Bailey bore the burden to prove that in transferring the funds to his Barnett account he did not depart from his fiduciary role, and he did not carry that burden.

The record does not show that he regarded the funds in the Barnett account as subject to restrictions on their use. We therefore hold that Mr. Bailey wrongly appropriated Biochem Pharma stock sale proceeds when he made transfers thereof to his Barnett money market account in the amounts of $175,037 in 1994[33] and $250,019 in 1995 (totaling $425,056) and that he received income for those amounts in those years.

D.     <u>Mr. Bailey did not realize income when he transferred loan proceeds from the advance account</u>.

The sale proceeds of $425,056, discussed above, constituted only about an eighth of the transfers of Biochem Pharma-derived funds from the Credit Suisse advance account. The remainder--slightly more than $3 million--was the proceeds not of sales but of loans that Mr. Bailey had taken out, using the Biochem Pharma stock as collateral. The Commissioner contends in the alternative that if the 602,000 shares of stock were not income to Mr. Bailey when he first received them in 1994, then the loan proceeds, like the sale proceeds, were income to Mr. Bailey when he actually appropriated them. The Commissioner argues that, if the Court holds that Mr. Bailey realized income only when he actually appropriated the funds,

---

[33]Mr. Bailey did not actually spend any of the sale proceeds on personal expenditures until 1995, but we hold that he nonetheless realized the income when he appropriated the funds by transferring them to an account on which he acknowledged no restrictions.

then the computation of that income should take into account the fact that

Mr. Bailey could borrow up to only 25 percent of the value of the stock. The

Commissioner argues that Mr. Bailey's $3 million of loans in fact employed

$12 million of stock value, and $12 million of income should therefore be imputed

to him from the value of the stock.

This valuation argument, however, is upside down. The Commissioner would

value the $3 million of cash that Mr. Bailey received in loans by the $12 million

worth of collateral that he had to use to obtain it, and would impute $12 million in

income--but this reverses the economics of the situation. The question should be:

How much income did Mr. Bailey actually realize from his use of $12 million of

Biochem Pharma stock? The answer to that question is easy: He was actually able

to obtain $3 million (in loans); and $3 million was therefore the value to him of the

use of the stock and is therefore the amount of income that would be imputed to him

if loan proceeds were income to him.

The Commissioner's second alternative argument is that Mr. Bailey realized

income in the actual amounts of the loan proceeds (about $3 million) when he

received them. Mr. Bailey denies that these amounts constituted income. He

personally guaranteed the loans, and with great difficulty he borrowed from others

and repaid the loans in 1996. He therefore invokes a basic tax principle: "[I]t is

settled that receipt of a loan is not income to the borrower." <u>Commissioner v. Indianapolis Power & Light Co.</u>, 493 U.S. 203, 207 (1990). This principle is correct; but when Mr. Bailey previously made this contention in a motion for summary judgment, the Court denied his motion because the issue is complicated by Mr. Bailey's use of the Biochem Pharma stock as collateral for those loans, and this use of the stock generated factual issues that could not be resolved under Rule 121. After a trial, we can now decide this question.

In these cases, as in <u>Webb v. IRS</u>, 15 F.3d at 205, the loan-proceeds-as-income issue--

> is centered at the confluence of two fundamental principles of federal tax law. On the one hand, <u>bona</u> <u>fide</u> loan proceeds are not gross income to the borrower, <u>see</u> <u>Commissioner v. Indianapolis Power & Light Co</u>., 493 U.S. 203, 207-08, 110 S.Ct. 589, 592-93, 107 L.Ed.2d 591 (1990), because the contemporaneous economic benefit realized upon receipt of the loan proceeds is counterbalanced by the borrower's legal obligation to repay the loan. <u>See</u> <u>McSpadden v. Commissioner</u>, 50 T.C. 478, 491, 1968 WL 1490 (1968). The factual determination as to whether a particular transaction is a bona fide loan turns on whether there are sufficient indicia of the parties' intention that the monies advanced were to be repaid. <u>See</u> <u>Crowley v. Commissioner</u>, 962 F.2d 1077, 1079 (1st Cir. 1992); <u>Moore v. United States</u>, 412 F.2d 974, 978 (5th Cir.1969). At the same time, a line of Supreme Court cases indicates that monies and other property acquired by misappropriation must be reported as income in the year of their receipt. <u>See</u> <u>James v. United States</u>, 366 U.S. 213, 221, 81 S. Ct. 1052, 1056, 6 L. Ed.2d 246 (1961) (embezzlement proceeds); <u>Rutkin v. United States</u>, 343 U.S. 130, 137-38, 72 S.Ct. 571, 575-76, 96 L.Ed. 833 (1952) (extortion proceeds).

Aided by the Court of Appeals for the First Circuit's analysis in <u>Webb</u>,[34] we hold that the Credit Suisse loan proceeds were not income to Mr. Bailey.

In <u>Webb</u>, a trustee misrepresented the eligibility of his solely owned Massachusetts business trust for a storm disaster loan from the U.S. Small Business Administration (SBA) and diverted a portion of the loan proceeds from the trust for his personal use. <u>Id.</u> at 204. The IRS determined that the trustee had unreported embezzlement income in the amount of the diverted loan proceeds and the District Court granted summary judgment to the IRS. <u>Id.</u> at 205. On appeal, the trustee argued (i) that the diverted loan proceeds constituted a de facto loan from the SBA to him, and (ii) that loan proceeds are not income under <u>James v. United States</u>, 366 U.S. 213 (1961). <u>Webb</u>, 15 F.3d at 206-207.

Although the Court of Appeals for the First Circuit agreed that loan proceeds are not income, it upheld the IRS's determination and affirmed the District Court because it found that the diverted loan proceeds were <u>not</u> a loan under the so-called <u>James</u> "consensual recognition" test. <u>Id.</u> at 207-208. Under the <u>James</u> test, a loan is recognized as such for tax purposes if there is "the consensual recognition, express or implied, of an obligation to repay" the loan.

---

[34]Under section 7482(b)(1)(A), an appeal from a decision in these cases would be made to the Court of Appeals for the First Circuit.

James, 366 U.S. at 219.  The Court of Appeals found that the only borrower with a "consensual recognition" of an obligation to repay the SBA was the trust, and further found that there was no proof of any loan or obligation between the trust and the trustee.  Webb, 15 F.3d at 207-208.

However, the facts of Webb are very unlike those of the instant cases.  There is no dispute (i) that Credit Suisse made directly to Mr. Bailey the loans that were collateralized by the Biochem Pharma stock, (ii) that he was personally liable for those loans, (iii) that he intended to repay Credit Suisse, (iv) that Credit Suisse insisted that he repay the loans--even when he became incarcerated--before it would release the collateral, and (v) that he actually repaid Credit Suisse in 1996.  On those facts and in the absence of any evidence to the contrary, we find that there was a "consensual recognition" of Mr. Bailey's obligation to repay the loans to Credit Suisse.  Under the James test, the loan proceeds from Credit Suisse were the product of a loan to Mr. Bailey, and thus, are not includible in his gross income.

However, the Commissioner contends that Mr. Bailey must nonetheless recognize the loans from Credit Suisse as income, because he misappropriated the value of the Biochem Pharma stock by using it as collateral for those loans.  We disagree.   The receipt of a loan is not income to the borrower where the borrower

uses another person's property as collateral to obtain that loan--even where the collateral is obtained under false pretenses or is otherwise misappropriated--as long as there is a "consensual recognition" that the borrower will repay the loan. See Kreimer v. Commissioner, T.C. Memo. 1983-672 (holding that loan proceeds were not income to taxpayers who borrowed money through a series of shell companies and fraudulently issued bonds in another corporation's name to secure those loans, because the taxpayers treated the loans as bona fide debt and the facts showed a "consensual recognition" of all parties involved that the loans would be repaid).

Even though Mr. Bailey received most of the alleged income as loan proceeds, the Government argues here that it was income to him because his use of the Biochem Pharma stock as collateral was a knowing misappropriation that they criticize in no uncertain terms. It is indeed clear--with the benefit of hindsight--that Mr. Bailey was not entitled to use the Biochem Pharma stock as collateral to secure loans for his personal use, and we certainly do not condone Mr. Bailey's failure to draw clear lines between his personal financial interests and the other interests he was bound to promote; but viewing Mr. Bailey as a taxpayer, we find that the Government entered into a "vague and unusual" agreement with Mr. Bailey under which: he was given the broadest possible discretion to sell the stock or use it as

collateral; he and his co-counsel were led to believe that their compensation might amount to as much as $3 million; he and his co-counsel believed (wrongly) that they could take fees as they earned them (subject to a later accounting); he bore the risk (eventually realized) of zero compensation; he performed very substantial services for the Government's benefit[35] for which he was never paid; and his belief that he owned the right to any appreciation in the value of the stock, though mistaken, survived two dispositive motions in the Court of Federal Claims[36] and was eventually decided only after a nine-day trial, after which the court, though holding against Mr. Bailey, stated that it found him to be one of the three "most consistently credible of the witnesses testifying at the trial." Bailey II, 54 Fed. Cl. at 463.

In these cases the Court asked Mr. Kirwin "Why was this arrangement not reflected in a written agreement?", and Mr. Kirwin answered candidly:

---

[35]The Court asked U.S. Attorney Thomas Kirwin, "How many of your criminal defense attorneys end up taking on responsibilities of the sort that Mr. Bailey took on?" Mr. Kirwin answered, "in my experience, almost none. But, this case is different than many of our cases." Mr. Kirwin acknowledged that he has never heard of any other case in which a criminal defense attorney agreed with the Government to manage assets, to postpone for years any payment of his fees, and to risk complete nonpayment of fees if the assets' value declined.

[36]See Bailey II, 40 Fed. Cl. 449 (denying motion to dismiss for lack of jurisdiction); Bailey II, 46 Fed. Cl. 187 (denying motion to dismiss for lack of jurisdiction and for failure to state a claim).

Well, I ask myself that question about every three months, your Honor. You know, it should have been. It absolutely should have been. That is a huge mistake that was made. * * * I just don't think anybody thought about the need to put it in writing.

The Government thus admits that its failure to reduce to writing its agreement with Mr. Bailey was a mistake; and we find that part of the Government's mistake was its failure to make clear the restrictions that it intended about Mr. Bailey's use of the stock. On the record before us we find that Mr. Bailey did not know he was violating the agreement when he used the Biochem Pharma stock as collateral for his loans from Credit Suisse. Rather, he borrowed the money from Credit Suisse in good faith, in his own name, and with a full expectation of paying it back (which he did).

However, even if Mr. Bailey had intentionally misappropriated the stock as collateral (more like the taxpayers in Kreimer), that fact would not convert bona fide loans into misappropriation income so long as Mr. Bailey and Credit Suisse had a "consensual recognition" that he would repay the loans. There is no exception to the James test for loans that were secured by another person's collateral[37]--no matter how it was obtained--and "any broader reading of the

---

[37]In our prior order dated April 29, 2009, denying the parties' cross-motions for summary judgment, we overstated the significance of the Biochem Pharma stock as collateral, suggesting that "here 'the borrower's legal obligation to repay'

(continued...)

language in <u>James</u> would be unwarranted on the basis of the facts of that case and all subsequent decisions which have considered the issue." <u>Kreimer v. Commissioner</u>, T.C. Memo. 1983-672.

III.     <u>Due process and Mr. Bailey's income from the Broder litigation</u>

Among the items of income that Mr. Bailey did not report in the years at issue, and that the IRS attributed to him, was the $1,650,000 from Mr. Broder that, Mr. Bailey says, constituted "fees due him", but part of which was paid to the District Court on Mr. Bailey's behalf in 1997 and the remainder of which was paid in 1998 to third parties who had lent Mr. Bailey money in 1996 to repay Credit Suisse's advances to Mr. Bailey so that Credit Suisse would release his collateral, the Biochem Pharma stock, and the Broder payments were used to repay their loans in 1998. It is true that Mr. Bailey did not get to keep any of the Broder payments, and that the payment made directly to the District Court was compelled by that court; but income earned by a taxpayer is taxable to him, even if he directs that it be paid to someone else, <u>see</u> <u>Lucas v. Earl</u>, 281 U.S. 111 (1930), or if it is

_____

[37](...continued)
was overwhelmed by the fact that the lender held highly marketable collateral-- collateral that did not belong to the borrower--which would satisfy the unpaid loan." In so saying we implied a standard not acknowledged in <u>Webb</u> or <u>James</u> and contradicted in <u>Kreimer</u>. The existence of collateral (to protect the lender), whether rightly obtained or wrongly obtained, does not undermine the borrower's obligation.

applied to satisfy his debt, <u>Old Colony Trust Co. v. Commissioner</u>, 279 U.S. 716, 729 (1929) ("The discharge by a third person of an obligation to him is equivalent to receipt by the person taxed"); <u>Tucker v. Commissioner</u>, 69 T.C. 675, 678-679 (1978).

Mr. Bailey argues, however, that these Broder payments should not be treated as income to him because of violations of the Fifth Amendment to the U.S. Constitution, which provides that "No person shall * * * be deprived of life, liberty, or property, without due process of law". Mr. Bailey contends that he was denied due process[38] when the Government contrived a debt he did not really owe (i.e., the Biochem Pharma stock) and forced him to satisfy it with the Broder

---

[38]Mr. Bailey also seems to invoke the takings clause of the Fifth Amendment ("nor shall private property be taken for public use, without just compensation") when he asserts, "There is no question but what the government 'took'" the Broder payments. However, when the Government takes a person's property not "for public use" but rather to pay the person's private debt, that is not a Fifth Amendment "taking". <u>See</u> <u>Skillo v. United States</u>, 68 Fed. Cl. 734, 743 (2005) ("'This Court and other courts have routinely held that the lawful exercise of the Government's collection powers does not amount to a prohibited Fifth Amendment "taking".'") (quoting <u>Kerrigan v. United States</u>, 1997 WL 685275, at *5 (Fed. Cl. Apr. 30, 1997)). Moreover, this Court has not been granted jurisdiction to adjudicate a Fifth Amendment "taking" claim. Rather, such claims must be litigated in the Court of Federal Claims (under 28 U.S.C. sec. 1491(a)(1) (2006)) or in Federal District Court (under 28 U.S.C. sec. 1346(a)(2) (2006)).

payments.[39]  This due process argument stumbles at the starting block, for two related reasons.  First, these allegations concern supposed defects in prior judicial proceedings, which were (or could have been) reviewed on appeal from those proceedings.[40]  The Tax Court does not sit as a court of review of the decisions of other courts.  Second, these allegations ultimately dispute a holding--i.e., that Mr. Bailey did not acquire rights to the Biochem Pharma stock in 1994 and was therefore required to return the stock and its proceeds--that Mr. Bailey is collaterally estopped from disputing, for the reasons explained above in part I.B.[41]

---

[39]Specifically, Mr. Bailey alleges that in Bailey I he was wrongly denied the ownership of the Biochem Pharma stock; that he was denied compensation for his labor in repatriating Duboc's assets; that by misrepresentations the Department of Justice induced the Federal District Court to demand immediate return of the Biochem Pharma stock in 1996; that the Federal District judge refused to hear some of his arguments and evidence and refused to recuse himself though he ought to have been a witness; that Mr. Bailey was unjustly jailed until he could come up with $2.3 million; that the appellate court "missed or avoided the central argument"; and that the Department of Justice held up the renomination of the Court of Federal Claims judge who was handling Bailey II, thereby prompting an adverse outcome that denied him the appreciation on the Biochem Pharma stock.

[40]In Bailey I, decisions of the District Court for the Northern District of Florida had to be appealed to the U.S. Court of Appeals for the Fifth Circuit, 28 U.S.C. secs. 1291, 1294(1), and decisions of the Court of Appeals for the Fifth Circuit had to be appealed to the U.S. Supreme Court, 28 U.S.C. sec. 1254.  In Bailey II, decisions of the Court of Federal Claims had to be appealed to the U.S. Court of Appeals for the Federal Circuit.  28 U.S.C. sec. 1295(a)(3).

[41]Mr. Bailey also alleges that the Department of Justice violated due process

(continued...)

Mr. Bailey was held by the District Court to be obliged to reimburse the Government for the stock sales; and he admits that he was personally obliged to repay the Credit Suisse loans, which in turn were paid by third parties whom he was then liable to pay. That being the case, the Broder payments made to the District Court and to these third parties satisfied obligations of Mr. Bailey, and they are income to him even if he never had the money in hand.

Mr. Bailey's last due process argument is that pressure from the Department of Justice fomented errors in the notice of deficiency. It certainly is in our jurisdiction to review the notice of deficiency, and we do have the power to remedy any errors in it. However, this contention is little more than a repetition of Mr. Bailey's argument that IRS animus should affect the burden of proof. As we stated in part I.A.3. above, there is no warrant here to look behind the notice of deficiency and examine the IRS's motives. If the evidence shows that adjustments in the IRS's notice of deficiency cannot be sustained, then the Commissioner could not prevail by proving that the agent was sincere; likewise, if the evidence

---

[41](...continued)
by engineering his disbarment. Of course, the Tax Court does not have (and Mr. Bailey does not suggest that we have) jurisdiction to review his disbarment proceedings or the power to reinstate his license to practice law. And even if we could determine that he had been unjustly disbarred, we could not remedy that wrong by excusing him from tax liability on income that we find he did receive.

shows that the adjustments were correct, Mr. Bailey could not prevail by proving

that the agent was prejudiced. The issue here is not the agent, the agency, or the

audit but rather Mr. Bailey's tax liability.

IV.     Whether activities are engaged in for profit: general principles

Next at issue is Mr. Bailey's entitlement to deductions for the 1993 through

2001 tax years that arose from the yacht rental activity and the airplane

remanufacturing activity[42] that he conducted through his two wholly owned S

corporations. A taxpayer who is carrying on a trade or business may deduct

ordinary and necessary expenses incurred in connection with the operation of the

business. Sec. 162(a). However, a taxpayer generally may not deduct expenses

incurred in connection with a hobby or other nonprofit activity to offset taxable

income from other sources. Sec. 183(a). Section 183(c) defines an "activity not

engaged in for profit" as "any activity other than one with respect to which

deductions are allowable for the taxable year under section 162 or under paragraph

---

[42]The regulations provide that "all the facts and circumstances" must be taken into account to determine the activity or activities of the taxpayer. 26 C.F.R. sec. 1.183-1(d)(1), Income Tax Regs. On the basis of all the facts and circumstances, we find that Mr. Bailey conducted the airplane rental activity, yacht rental activity, and airplane remanufacturing activity as (three) separate activities for purposes of section 183. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990). Mr. Bailey conducted the three activities as separate activities for accounting purposes. He also hired a different set of employees to manage and carry out each activity.

(1) or (2) of section 212." An activity constitutes a "trade or business" within the meaning of section 162--and it escapes the limitation of section 183--if the taxpayer's actual and honest objective is to realize a profit. Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), aff'g in part and rev'g in part T.C. Memo. 1993-519. The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); 26 C.F.R. sec. 1.183-2(a), Income Tax Regs. Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); 26 C.F.R. sec. 1.183-2(b). Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), aff'd, 792 F.2d 1256 (4th Cir. 1986); 26 C.F.R. sec. 1.183-2(a).

Section 1.183-2(b) of the regulations provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities;

(6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. This list is nonexclusive, and the number of factors for or against the taxpayer is not necessarily determinative. Rather, all facts and circumstances must be taken into account, and more weight may be given to some factors than to others. Id.; see Dunn v. Commissioner, 70 T.C. 715, 720 (1978), aff'd, 615 F.2d 578 (2d Cir. 1980).

We now address these nine factors with respect to the yacht rental activity and the airplane remanufacturing activity.

V.      Analysis of Mr. Bailey's yacht rental activity

Mr. Bailey conducted the yacht rental activity through PBR from 1993 until the Government took control of the Spellbound in 1996. Mr. Bailey concedes that he never intended to profit from yacht rentals per se, and we therefore do not analyze that activity for a profit motive. Rather, Mr. Bailey contends that the yacht rental activity was really the continuation and winding down of his previous yacht refurbishing activity, which (he alleges) was engaged in for profit. Mr. Bailey also contends that the Commissioner is estopped by a settlement agreement from contesting his profit motive for the yacht rental activity.

Even if Mr. Bailey's yacht rental activity is viewed as a continuation of his previous yacht refurbishing activity, we find that it was not engaged in for profit during tax years 1993 though 1996.[43] We also find that the Commissioner is not estopped from contesting Mr. Bailey's profit motive.

A.      Lack of profit motive for yacht refurbishing activity

Mr. Bailey contends that the yacht rental activity was really the continuation and winding down of his previous yacht refurbishing activity. He contends that the yacht refurbishing activity was engaged in for profit (i) before the tax years at issue, when he attempted to use the Spellbound as a prototype to refurbish and sell other used yachts, and (ii) during the tax years at issue, when he was winding down the yacht refurbishing activity. As Mr. Bailey correctly notes, a taxpayer does not lack a profit motive merely because his business fails and he takes a reasonable time to unwind it and minimize his losses.[44]

---

[43]Mr. Bailey contends that he is entitled to deduct "yacht-based expenses" from 1993 until PBR sold the Spellbound in 1998. We find that the yacht rental activity was not engaged in for profit. See pt. V.C. below. In addition, we find that the record provides even less support for Mr. Bailey's contention that his attempts to sell the Spellbound during the 1996 through 1998 tax years constitute an activity that was engaged in for profit. Accordingly, we hold that Mr. Bailey lacked the requisite profit motive for the yacht rental and sale activities during all of the tax years at issue.

[44]See Helmick v. Commissioner, T.C. Memo. 2009-220, slip op. at 27-28

(continued...)

However, if the deductibility of the suit-years' yacht-related expenditures depends on the for-profit character of the pre-suit-years' yacht refurbishing activity, then it was incumbent on Mr. Bailey to prove that for-profit character. He did not do so, as the following consideration of the nine factors listed above shows.

### 1. Manner in which the activity is conducted

Mr. Bailey kept his records for the yacht activity in the Lantana hangar before discarding them, but the record contains only Mr. Bailey's general claims about the adequacy of the records, and does not provide needed details about their type or quality. Mr. Bailey discarded those records (after giving the IRS an opportunity to review and copy them). Mr. Bailey thus failed to prove whether he kept records for the activity in a business-like manner. Mr. Bailey does not allege, nor does the record show, that he changed his operating methods to improve the profitability of the yacht refurbishing activity. This factor--the manner in which the activity is conducted--is strongly in the Commissioner's favor.

---

[44](...continued)
(after "a catastrophic loss that could never be recouped," a taxpayer who "thereafter expected to generate an overall prospective profit * * * could not be said to lack a profit objective after the disaster merely because he would never recoup the prior loss").

## 2. Expertise of the taxpayer and his advisers

Mr. Bailey was an aviator, a lawyer, a speaker, an author, and a past owner of a helicopter company; but when he acquired the Spellbound he had no prior experience in yacht selling or refurbishing. Mr. Bailey did hire experts--Dennison Marine and the Roscioli Yachting Center--to execute his plans to refurbish the Spellbound; but he offered no evidence other than his own general testimony to show that they actually collaborated with or advised him in establishing a business of which the Spellbound was to be a prototype. We are not convinced that he was much more than a retail customer of Dennison Marine and the Roscioli Yachting Center. This factor--expertise--is in the Commissioner's favor.

## 3. Time and effort expended

Mr. Bailey did not establish how much time or effort he spent in refurbishing the Spellbound or developing a plan to sell yachts. Instead, Mr. Bailey was otherwise employed with his law practice. This factor--time and effort--is in the Commissioner's favor.

4.     Expectation that assets may appreciate in value

Mr. Bailey testified that he did not expect the Spellbound to appreciate.  This factor--expectation that assets may appreciate--is in the Commissioner's favor.

5.     Taxpayer's success in similar or dissimilar activities

Though Mr. Bailey's career has been remarkably varied, he was not ever involved in a business venture similar to refurbishing and selling yachts.  This factor--success in similar or dissimilar activities--is in the Commissioner's favor.

6-7.    History of income or loss, amount of occasional profits

Mr. Bailey refurbished only one yacht, the Spellbound, had difficulty selling it, and never used it as a prototype.  Mr. Bailey's summaries show that the Spellbound generated a significant loss every year and a total loss of $922,137 over its brief four-year course.  These factors--history of income or loss, and occasional profits--are moderately in the Commissioner's favor.

8.     Financial status of the taxpayer

Substantial income from sources other than the activity in question, particularly if offset by claimed losses from the activity, may indicate that the activity is not engaged in for profit.  On the other hand, a lack of income from sources other than the activity in question may make a profit objective more likely.

26 C.F.R. sec. 1.183- 2(b)(8).  Mr. Bailey's average gross income from his law practice and speaking services exceeded $1 million a year during the tax years at issue, and he claimed the activity's losses to significantly reduce his income tax liabilities.

Mr. Bailey concedes that he "had a solid income from other sources" but insists that he "did not purposefully arrange to lose money through aircraft rental operations".  However, in determining whether, under section 183, an activity is engaged in for profit, greater weight is given to objective facts than to a taxpayer's mere statement of intent.  Mr. Bailey could afford to maintain a yacht for his use even if there was no expectation of future profit.

This factor--financial status--is in the Commissioner's favor.

### 9.     Elements of personal pleasure

The Commissioner contends that Mr. Bailey took a great deal of personal pleasure from sailing on the Spellbound with his family and friends, but Mr. Bailey claims that "[i]t's no fun to drive a boat".  Mr. Bailey testified that the steering wheel and navigational instruments of the Spellbound are isolated from the rest of the deck, and the pilot is therefore isolated from the party-goers on the deck.

While it may be true that Mr. Bailey did not enjoy piloting the yacht, the record belies the claim that he derived no personal pleasure from it.  First, the Spellbound was built to Mr. Bailey's specifications, and he testified that it was beautiful.  Second, the record does not show that Mr. Bailey always took on the job of piloting the Spellbound.  PBR hired a captain and crew to sail and maintain the Spellbound, and Mr. Bailey could have used their services to pilot the yacht any number of times.  Even assuming arguendo that Mr. Bailey piloted the Spellbound on every personal trip--and that he disliked the task--we find that he derived pleasure from sharing the yacht with his family and friends and that he anticipated doing so when he purchased the yacht in 1989.

This factor--elements of personal pleasure--is in the Commissioner's favor.

10.    Conclusion

We do not conclude that Mr. Bailey's contention that he intended to refurbish and sell yachts is a complete fabrication.  He may well have contemplated the idea when deciding to buy the yacht, and he may have entertained the possibility as another justification for going ahead and making the purchase.  But there is no indication that operating an activity of refurbishing and selling yachts for profit was the real or principal reason he bought the yacht.  Consequently, we find that the yacht refurbishing activity before the years at issue

was not entered into for profit; therefore, the winding down of that activity in the years at issue, involving the rental of the yacht, was not the continuation of a for-profit activity.

### B. Equitable estoppel

#### 1. Alleged agreement

Mr. Bailey contends that the Commissioner is estopped by a settlement agreement from contesting his profit motive for the yacht rental activity. Mr. Bailey alleges that he and the IRS entered into a settlement agreement in 1996 which stipulated that Mr. Bailey's yacht refurbishing activity had been engaged in for profit for the 1990 through 1992 tax years. Revenue Agent Tabor acknowledges that he allowed Mr. Bailey favorable treatment on this issue for 1990 through 1992; but the only evidence of any written agreement is Mr. Bailey's testimony that "I think there's a letter out there, somewhere" that memorialized the alleged settlement agreement. Mr. Bailey did not submit into evidence a copy of the alleged settlement agreement or any other evidence to suggest that a settlement was reached, and we find that there was no such settlement.

Even if there had been a settlement as to the years 1990 through 1992, it would not govern the subsequent years that are now before us. Generally, "each taxable year stands alone, and the Commissioner may challenge in a succeeding

year what was condoned or agreed to in a previous year." Rosemann v.

Commissioner, T.C. Memo. 2009-185 (citing Auto. Club of Mich. v. Commissioner,

353 U.S. 180 (1957), and Rose v. Commissioner, 55 T.C. 28 (1970)).

2. Alleged misleading

Mr. Bailey also asserts estoppel arising from his allegation that the IRS

misled him. He asserts that the IRS misled him about its intention to challenge his

profit motive for the yacht rental activity by agreeing that the yacht refurbishment

activity was engaged in for profit. Equitable estoppel is a judicial doctrine that

precludes a party from denying that party's own acts or representations that induce

another to act to his or her detriment; and in extraordinary circumstances, equitable

estoppel may bar the Commissioner from challenging his previous determinations;

but the doctrine is to be applied against the Commissioner only with caution and

restraint. See McCorkle v. Commissioner, 124 T.C. 56, 68 (2005). The essential

elements of estoppel are: (i) there must be a false representation or wrongful

misleading silence; (ii) the error must be in a statement of fact and not in an opinion

or a statement of law; (iii) the person claiming the benefits of estoppel must be

ignorant of the true facts; and (iv) he must be adversely affected by the acts or

statements of the person against whom estoppel is claimed.  Id.; see also Dickow v. United States, 654 F.3d 144, 152 (1st Cir. 2011).

In particular, Mr. Bailey contends that he discarded his records for the yacht rental activity after June 2002 only because Revenue Agent Tabor "never suggested, until 2004, that * * *[the yacht rental activity] was anything but a business".

However, Mr. Bailey has not met his burden to prove that (i) the IRS deceived or misled him (ii) about a factual issue that relates to his profit motive for the yacht rental activity (iii) of which he was ignorant and (iv) as to which relied on the IRS on to his detriment.  In fact, the record contradicts Mr. Bailey's contention that Revenue Agent Tabor "never suggested" that the IRS might challenge his profit motive for the yacht rental activity until 2004.  Revenue Agent Tabor issued five IDRs to Mr. Bailey in April 2002 that each made requests with respect to the profitability of the yacht rental activity--two years before 2004, and only weeks before June 2002, when Mr. Bailey gave the IRS a final opportunity to review and copy his records before he discarded them.  Thus, Revenue Agent Tabor was visibly investigating Mr. Bailey's profit motive weeks before the records were discarded, and Mr. Bailey had no reason to suppose that the IRS had conceded the issue.

Accordingly, we hold that the Commissioner is not estopped from contesting Mr. Bailey's profit motive for the yacht rental activity.

C.    Lack of nexus between yacht refurbishing and yacht rental

Even if we were to find that Mr. Bailey's yacht refurbishing had been a for-profit activity in the prior years, or were to hold that the Commissioner was estopped from contending otherwise, we would still have to evaluate his claim that his yacht rental activity in the years at issue was merely the unwinding of that prior activity.  Mr. Bailey did not simply rent out the yacht to pay his docking fees and other inevitable expenses of holding the Spellbound for sale.  Mr. Bailey entertained his family and friends on the Spellbound.  Although he claims that his personal use constituted only a "small percentage" of the total use of the Spellbound,[45] the record shows otherwise.  First, Mr. Bailey's summaries of revenue and expenses show that the yacht rental activity generated more than 10 times higher expenses than charter fees.  Second, the timesheets kept by the crew of the Spellbound for 1995 show that the crew devoted at least twice as much time to personal or unpaid trips as it did to

---

[45]Mr. Bailey testified that he deducted only 90 percent of the expenses of the Spellbound, because he operated under the assumption that 10 percent of the total use of the Spellbound was personal.  However, in his reply brief, Mr. Bailey requests this Court to find that 20 percent of the total use of the Spellbound was personal.

paid charters. Most of the use of the <u>Spellbound</u> was personal during the tax years at issue.

If the <u>Spellbound</u> had been originally purchased and refurbished for business purposes, we would conclude that in the years at issue it was converted to personal use and that the rentals were simply a means of covering some of the cost of that personal use.

D.      <u>Tax consequences</u>

Because the yacht rental activity was not engaged in for profit, under section 183(b)(2) Mr. Bailey can deduct his yacht expenses only to the extent of yacht income. The notices of deficiency accomplish this effect by including in Mr. Bailey's income PBR's yacht rental receipts and capital gains and then allowing him deductions for PBR's expenses in the same amounts--deductions, however, that are subject to the limit of section 67(a) (i.e., as "miscellaneous itemized deductions" allowable only to the extent that in the aggregate they exceed 2 percent of adjusted gross income), because they are not among those excluded from that limit by section 67(b). The notice of deficiency is sustained in this regard.

VI.    Analysis of Mr. Bailey's airplane remanufacturing activity

Mr. Bailey's airplane remanufacturing activity presents a sharp contrast to his yacht activity.  He conducted the airplane remanufacturing activity--"Project 288"-- from 1994 until its chief inspector and director of maintenance resigned in April 1996.  On the basis of all the facts and circumstances, we do find that Project 288 was engaged in for profit from 1994 to April 1996.

A.    Profit motive under section 183

Examining the nine factors suggested in the regulations under section 183, we find that the activity was engaged in for profit.

1.    Manner in which the activity is conducted

Mr. Bailey failed to prove that he kept records for the airplane remanufacturing activity in a business-like manner.  Although we found that Mr. Bailey kept his records for the activity in the Lantana hangar before discarding them, the record does not show their type or quality.  This tends against a finding of a profit motive.

However, a strong business-like feature of Project 288 was Mr. Bailey's attempt to obtain FAA approval for the modifications his company developed for the Twin Comanche design and then applied to the Bailey Bullet.  PBR contracted for the services of Bill Wall, who served as the administrator of East Coast

Avionics, an FAA-certified designated alteration station. In that capacity, he was authorized to issue supplemental type certificates on behalf of the FAA to approve modifications to aircraft designs. On September 21, 1995, Mr. Wall issued five supplemental type certificates to PBR, which approved a number of the modifications that he helped to develop for Project 288.

As the Commissioner correctly notes, the issuer of a supplemental type certificate is required to file, inter alia, two copies of the certificate with the FAA within 30 days of the date of issue. 14 C.F.R. sec. 21.463 (1995). Mr. Wall apparently failed (unbeknownst to Mr. Bailey) to file the required copies of the five supplemental type certificates with the FAA, and this failure makes questionable the validity of those certificates. However, even if the five supplemental type certificates are invalid, that fact does not indicate that Mr. Bailey failed to conduct Project 288 in a business-like manner. Mr. Bailey reasonably relied on Mr. Wall to carry out his regulatory duty and file the required copies with the FAA. Mr. Bailey had no reason to suspect that Mr. Wall would fail to do his job. Mr. Wall's lapse did not evidence any lack of seriousness on Mr. Bailey's part about obtaining permission to resell remanufactured planes.

Ultimately, the fact that Mr. Bailey engaged in the sophisticated and costly process of obtaining "multi-use" supplemental type certificates to modify an

aircraft design--rather than simply applying for the simpler and cheaper "one-off" field approval to modify a single aircraft for his personal use--is weighty evidence that he conducted Project 288 in a business-like manner. It is difficult to explain this effort unless Project 288 was undertaken with an intention to make a profit as Mr. Bailey alleges.

We conclude that this factor--the manner in which the activity is conducted--is overall in Mr. Bailey's favor, indicating that he had the requisite profit objective.

### 2. Expertise of the taxpayer and his advisers

By 1993 Mr. Bailey had modest relevant expertise: He had decades of experience in flying small airplanes, which acquainted him with the industry, the product, and its market. His law practice gave him general experience in running a business. And for 10 years he had owned Enstrom Helicopter Corp. While that relevant expertise was arguably modest, Mr. Bailey consulted with and hired an impressive array of experts in the aviation industry to assist him with the conduct of Project 288. First, Mr. Bailey consulted with Robert A. Hoover, a famed air show and test pilot; Charles B. Cusick, an aeronautical engineer and former executive with Narco and Cessna Aircraft Co.; and LeRoy Patrick LoPresti, an aeronautical engineer and former executive with Beechcraft and Piper Aircraft,

Inc., before selecting the Twin Comanche over the Beechcraft Baron as the focus of Project 288. Second, Mr. Bailey hired Douglas Vasco, an FAA-certified designated airworthiness representative, as the chief inspector and director of maintenance for Project 288. He also hired two FAA-certified airframe and powerplant mechanics to work under Mr. Vasco. Third, Mr. Bailey contracted for the services of Bill Wall, the administrator of an FAA-certified designated alteration station, to develop and approve modifications to the Twin Comanche design and apply those modifications to the Bailey Bullet. The quantum, sophistication, and content of this advice was beyond what any hobbyist would have obtained and makes sense only in view of Mr. Bailey's plan to refurbish airplanes as a business.

We conclude that this factor--expertise--is in Mr. Bailey's favor and indicates that he had the requisite profit objective.

### 3. Time and effort expended

Mr. Bailey contends that he was very "hands-on" in managing Project 288 and spoke with his employees and contractors on a regular basis. Mr. Bailey did personally choose the features that were added to the Bailey Bullet, but Mr. Bailey was busy with his law practice. He hired about a dozen employees to disassemble

and reconstruct the airplanes, and the record does not show how closely he managed Project 288.

We conclude that this factor--time and effort--is neutral for assessing whether Mr. Bailey had the requisite profit objective.

### 4. Expectation that assets may appreciate in value

Mr. Bailey concedes that Project 288's "hardware", such as the Bailey Bullet, could not be expected to appreciate, but he contends that its "intangibles", such as the supplemental type certificates, could be expected to appreciate. We agree. Mr. Bailey expected the "multi-use" supplemental type certificates to appreciate, as his anticipated reselling business grew. He expected to install the modifications permitted by those certificates to an increasing number of Twin Comanches, and he actively tried to increase the value of that prospect by promoting the Bailey Bullet at the NBAA convention.

We conclude that this factor--expectation that assets may appreciate--is in Mr. Bailey's favor for assessing whether he had the requisite profit objective.

### 5. Taxpayer's success in similar or dissimilar activities

Mr. Bailey contends that he had prior success in two similar activities--his ownership of Enstrom Helicopter Corp. and his participation in an airplane refurbishing and rental company named Marshfield Aviation, both of which he

asserts were profitable. However, the record does not show much detail of Mr. Bailey's role in Enstrom and does not show whether the company was profitable. Morever, Mr. Bailey failed to establish that he was involved with Marshfield Aviation or any other business ventures related to leasing, buying, or selling aircraft. Thus, the record does not support Mr. Bailey's contention that he was involved with two profitable aircraft companies.

We conclude that Mr. Bailey failed to show success in similar activities and that this factor is in the Commissioner's favor.

### 6-7. History of income or loss, amount of occasional profits

In the tax years at issue, Mr. Bailey claimed losses from PBR, and Project 288 incurred losses for every year of its short history and never generated any profits. However, the Commissioner acknowledges that Project 288 was in its start-up phase during the 1994 through 1996 tax years. 26 C.F.R. section 1.183-2(b)(6), provides that a series of losses and a lack of occasional profits during the start-up phase of an activity may not necessarily be an indication that the activity is not engaged in for profit. See Strickland v. Commissioner, T.C. Memo. 2000-309. Accordingly, we decline to take the fact that Project 288 never generated a profit as an indication that it was not engaged in for profit.

We conclude that these factors--history of income or loss, and occasional profits--are neutral for assessing whether Mr. Bailey had the requisite profit objective.

### 8. Financial status of the taxpayer

As we discussed above in connection with the yacht activities, Mr. Bailey does not dispute that he was a successful attorney who earned millions of dollars during the tax years at issue. He therefore had an incentive to claim the activity's losses to reduce his income tax liability.

We conclude that this factor--financial status--is in the Commissioner's favor.

### 9. Elements of personal pleasure

Mr. Bailey contends that the Bailey Bullet was not developed or used for his personal enjoyment. Instead, he contends that Project 288 was his latest attempt to generate a stream of "business income" that would allow him, as he got older, to step back from his stressful and labor-intensive law practice.

Mr. Bailey is a veteran pilot who chose to work with small airplanes his entire career. Despite his protestations to the contrary, we have no doubt that Mr. Bailey enjoyed heading up Project 288 and flying the Bailey Bullet. However, several critical facts contradict the Commissioner's contention that Mr. Bailey

conducted Project 288 for personal pleasure or recreation. First, Mr. Bailey already owned several aircraft (through BEI and then PBR). He did not need to purchase or design a new airplane to take to the skies. Second, as is noted above, Mr. Bailey went to great lengths to obtain "multi-use" supplemental type certificates to modify an aircraft design. If pleasure had been the goal, and Mr. Bailey had merely sought to customize a single airplane for his personal use, then applying for a "one-off" field approval would seem to have been preferable.

We conclude that this factor--elements of personal pleasure--is neutral in determining whether Mr. Bailey had the requisite profit objective.

### 10. Conclusion

While some of the factors discussed above support the Commissioner's position and some are neutral, we are convinced that as a whole the record supports Mr. Bailey's contention that his airplane remanufacturing activity was engaged in for profit from 1993 through April 1996, and that he is therefore entitled to deduct the expenses attributable to that activity if and to the extent he substantiated them and showed that they are currently deductible.

B.      Timing of deductions

1.      The Commissioner's alternative contention

With small exceptions,[46] the Commissioner contends that the expenses

incurred in connection with Project 288 are not currently deductible and must be

disallowed.  The Commissioner's principal position--the one reflected in the

notices of deficiency--is that the expenses for Project 288 were not deductible

because it was not entered into for profit, a position we have rejected.  The

Commissioner makes an alternative contention--not reflected in the notices of

deficiency--that since Project 288 had only begun to produce a prototype and did

not ever develop a production line for the remanufacture and sale of airplanes,  its

expenses are nondeductible, because they were either start-up expenditures under

section 195 (i.e., incurred before the airplane refurbishing business was a going

concern)[47] or capital expenditures pursuant to section 263(a)(1) (i.e., incurred to

---

[46]The Commissioner concedes that PBR incurred in connection with Project 288 research expenditures of $30,635 in 1994 and $21,774 in 1995 that would be currently deductible if the activity was entered into for profit.

[47]"A taxpayer is not carrying on a trade or business under section 162(a) until the business is functioning as a going concern and performing the activities for which it was organized." Glotov v. Commissioner, T.C. Memo. 2007-147.  Until that time, expenses related to that activity are not "ordinary and necessary" expenses currently deductible under section 162 (nor are they deductible under section 212) but rather are "start-up" or "pre-opening" expenses.  Hardy v.

(continued...)

develop a capital asset, the Bailey Bullet).  The Commissioner has the burden of

proof for these contentions (which are "new matter[s]", see Rule 142(a)(1)).

    2.    Start-up expenditures

If the expenditures were start-up expenditures of a business, then they are not

currently deductible.  Section 195(a) generally disallows a current deduction for

start-up expenditures, and there is no evidence that Mr. Bailey made the election

under section 195(b) that would have entitled him to amortize his start-up

expenditures over 180 months.  Section 195(c)(1) defines "start-up expenditure" to

mean

    any amount--

        (A)  paid or incurred in connection with--

            (i)  investigating the creation or acquisition of an active trade or
            business, or

            (ii)  creating an active trade or business, or

            (iii)  any activity engaged in for profit and for the production of
            income before the day on which the active trade or business
            begins, in anticipation of such activity becoming an active trade
            or business, and

        (B)  which, if paid or incurred in connection with the operation of an
        existing active trade or business (in the same field as the trade or

---

[47](...continued)
Commissioner, 93 T.C. 684, 687-688 (1989).

> business referred to in subparagraph (A)), would be allowable as a deduction for the taxable year in which paid or incurred.

That is, an enterprise ceases to incur "start-up expenditures" when it becomes an "active trade or business".

When a taxpayer fails to make the election permitted by section 195, the consequence is that any start-up expenses incurred must be capitalized, see Vianello v. Commissioner, T.C. Memo. 2010-17, and can be deducted only when the activity ceases altogether, see Krebs v. Commissioner, T.C. Memo. 1992-154.

Under these principles, the Project 288 expenditures incurred in 1994 were start-up expenditures. However, in 1995 Project 288 was no longer a start-up but rather had graduated to going concern status. "[A]n enterprise need not have generated sales or other revenue to have begun to carry on a business, [but] it must nonetheless have started to function in a particular and identifiable line of work." Weaver v. Commissioner, T.C. Memo. 2004-108. Mr. Bailey established that in 1995 the Bailey Bullet was operational and airworthy and that in that year PBR, acting as a commercial vendor, presented the plane at a trade show to generate orders. The Commissioner presented no evidence to seriously contradict the conclusion that the Project 288 business was a going concern at this point, however ill fated it may have been. Project 288 continued briefly as a going

concern until 1996, when Mr. Bailey was incarcerated and the activity was decisively terminated.

### 3. Capital expenditures

If the expenditures were capital expenditures of building a specific asset (such as the supplemental type certificates, or the Bailey Bullet prototype), then they are part of the basis of that asset. The supplemental type certificates arguably became worthless when they were not filed in October 1995, but the Bailey Bullet remained unsold during the years at issue. The record does not show whether there were other distinct assets created by Project 288 expenditures.

To determine the timing of the deductibility of the Project 288 expenditures, we must determine whether and the extent to which the expenses for Project 288 are capital expenditures or start-up costs (a determination as to which, again, the Commissioner has the burden of proof).

### 4. Analysis

We first address the question whether specific amounts can be allocated to any assets other than Project 288 as a whole. The record suggests no assets created by Project 288 other than the Bailey Bullet plane and the supplemental type certificates. Beyond the research expenditures whose current deduction the

Commissioner concedes, no distinct expenditures can be allocated to the supplemental type certificates.

We therefore turn to the question of expenditures incurred to create the Bailey Bullet. We begin by noting the difficulty of distinguishing between expenditures for the start-up of a plane remanufacturing business and expenditures for the construction of the prototype plane. Simply to state that distinction is to indicate its difficulty, since those two notions overlap.[48] The development of a prototype is often a major part of starting up a business. The work done on a prototype may have a value that exceeds--and would not be justified by--the making of a single item. When the prototype plane was finished, PBR had not only one plane but also a substantial body of know-how and expertise that its team hoped to employ in building more planes. To attribute the entire cost of their work to the single plane they had produced might be completely contrary to business sense. Consequently, a well-prepared attempt to prove a distinction between the capital expenses of the Bailey Bullet and the start-up expenses of Project 288 would include substantial evidence, and perhaps expert testimony.

_____

[48]One can even say "that 'start-up' or 'pre-opening' expenses are capital in nature, given that they spring from the taxpayer's efforts to create or acquire a capital asset." Sorrell v. Commissioner, 882 F.2d 484, 488 (11th Cir. 1989) (emphasis added), rev'g T.C. Memo. 1987-351.

However, no evidence was offered at trial to make the distinction (which the Commissioner first raised during the course of trial) between start-up expenditures for the business per se and capital expenditures for the Bailey Bullet. We find, see supra note 22, in the absence of any more specific information, that PBR's expenditures fairly allocable to the building of the plane were $169,907 for 1994 and $169,907 for 1995. These amounts are capital and go toward Mr. Bailey's basis.

The remainder of the Project 288 expenses for 1994 (i.e., the total of $424,787, minus the $169,907 spent on the Bailey Bullet and the currently deductible research expenses of $30,635, yielding $224,245) constituted general expenses of the development of the Project 288 business--i.e., start-up expenditures not currently deductible that are deductible instead for 1996, the year that Project 288 was decisively terminated.

We have held that for 1995 Project 288 was no longer a start-up but rather had graduated to going-concern status. We therefore hold that the general expenses of Project 288 were currently deductible for 1995 and 1996. For 1995 those consisted of the total of $456,286, minus the Bailey Bullet expenses of $169,907 and the currently deductible research expenses of $21,744, yielding

$264,635. For 1996 those consisted of the entire Project 288 expenses of $125,694.

## VII. Miscellaneous adjustments

The notices of deficiency reflect numerous miscellaneous adjustments made by the agent to Mr. Bailey's income and deductions. We uphold them in large part, as is detailed below. The IRS's adjustments include computational adjustments prompted by changes to his adjusted gross income. Recomputation of these computational adjustments will be necessary and can be made when the parties recompute Mr. Bailey's liability pursuant to Rule 155. We therefore do not include them in the following discussion.

### A. Mr. Bailey's position

The primary counter-evidence that Mr. Bailey produced at trial to support his position and contradict the agent on these miscellaneous adjustments was Quicken registers and cashflow reports for the 1993 through 2001 tax years. That is, he did not offer receipts or other transactional documents to substantiate the items on his return; he simply relied on his secondary Quicken records.

For several of the years he lacked even those records; but on the eve of trial in 2009, Mr. Bailey was finally able to "unlock" password-protected copies of his Quicken database, from which he made new printouts for all nine years. The data

on the three available printouts made earlier (printed in October 1997 for tax year 1996, in October 2000 for tax year 1999, and in October 2001 for tax year 2000) and the data on the 2009 printouts for those same three years are not identical and cannot be correlated with each other.  We do not conclude that the later-produced printouts constitute an attempt to falsify the data; we presume that Mr. Bailey presented them in good faith; but we find them unreliable.  The differences between the 2009 printouts and the prior ones apparently arise from post-2002 data entries, so it is clear that the entries were not made contemporaneously during the years at issue (1993-2001).  Rather, they were evidently made after 2002 and before the later reports were printed in 2009.  In his testimony Mr. Bailey expressed the belief that the database used in 2009 might actually be an earlier version, not a later version, of the database that produced the printouts in 2002, but we cannot tell whether that is correct.  The later printouts may reflect entries made in good faith as intended corrections of the data; but the record does not show--and Mr. Bailey does not even claim to know--who made the corrections nor the information on which the corrections were based.

And in any event, the corrected data (if they are correct) on the later printouts (if they really are later) do not correspond to the tax returns. Mr. Bailey's arguments on brief often amount to demonstrating that amounts in

dispute are duly reflected in the 2009 printouts; but if he would thus rely on a later printout, then he would have to show that a disputed item of income that does appear on that printout also appears on the return, or that expenses that appear on the printout are not among those that the notice of deficiency allowed and did not adjust. To show that fees were duly reported on the 2009 printout is to prove only that they should have been reported on Mr. Bailey's tax returns; that showing does not prove that they actually were reported.

Rather than correlating the 2009 printouts with the returns, Mr. Bailey simply criticizes the Commissioner's position for failing to take into account the 2009 printouts. The Court has attempted to puzzle through Mr. Bailey's factual assertions and determine whether the 2009 printouts can be reconciled with the returns and correlated to the notices of deficiency, but the record does not include sufficient information to make possible such comparisons. That is, Mr. Bailey has largely failed in his burden of proof. Mr. Bailey did not show how the 2009 Quicken printouts support or tie to the amounts reported on his returns.

B.    Analysis

We now address the particular adjustments that the IRS made:

1.     Income items

a.     Barnett Bank interest

Mr. Bailey acknowledges that he received interest income of $207 in 1993 from Barnett Bank of Palm Beach County that was not reported on his 1993 Federal income tax return.

b.     Gross receipts

The IRS determined that Mr. Bailey had additional gross receipts under section 61(a)(2) in the amount of $86,808 in 1994, consisting of amounts (not related to Claude Duboc) that were deposited into Mr. Bailey's Credit Suisse account.  However, Mr. Bailey contends that the fees so paid were retainers not yet earned.  Mr. Bailey says that he treated the Credit Suisse account as if it were a sort of trust account for certain clients (in a manner similar to the arrangement he made with the Government for Duboc stock) and that when he had earned the fees, he transferred them to his Barnett account, which (he says) would have resulted in their being reported as income at that time, given the method he used for reporting income.  His contention is not implausible, but he does not point to any entry in the record showing any later-reported income items as including these amounts, and the Court is not able to find any such entries.  The IRS's adjustment in this respect is therefore sustained.

c.      Capital gain

The IRS determined that in 1994 Mr. Bailey had additional long-term capital gain income from the sale of 150,000 shares of Biochem Pharma stock on October 20, 1994.  However, we have held that the deposit of stock sale proceeds into Mr. Bailey's Credit Suisse advance account did not constitute an appropriation of those proceeds by him.  Rather, Mr. Bailey realized ordinary income upon his receipt of proceeds from the sale of the shares when the money was transferred to his Barnett account in 1994 and 1995.  The IRS's capital gain adjustment is therefore not sustained.

d.      Pension income

The IRS determined that Patricia Bailey had additional unreported pension income of $1,951.00 in 1993.   Mr. Bailey's response is to state in his brief that "I believe" that a Form 1099 for the income "was given to" his return preparer and so it was presumably reported on the return.  But Mr. Bailey did not show that he actually reported this item on his return, and the IRS's adjustment is sustained.

The IRS determined that Mrs. Bailey had additional pension income under section 61(a)(11) of $69,527 in 1999.  Mr. Bailey contends that $60,000 of the amount received "went to another, specifically Lana McGovern" (i.e., Mrs. Bailey's mother).  However, Mr. Bailey did not show that he or his wife reported this item,

and he did not show how a payment to his mother-in-law could have reduced their liability for tax on the pension income.

### e. Bartering income

The IRS attributed $10,183 of unreported bartering income to Mr. Bailey for 1995, but we conclude that the IRS misunderstood the transaction. In return for work done by a Project 288 employee, Mr. Bailey wrote a check from his law practice's account to pay a legal expense on behalf of that employee (i.e., fees to another law firm). If in return for the employee's services Mr. Bailey had rendered his own services, then that would have been barter--but that is not what happened. Instead, Mr. Bailey wrote a check for the employee's services.

### f. Deposits to office accounts

The IRS determined that in 1995, Mr. Bailey received $3,955 of reimbursements for expenses that had been deducted on the return, so those deposits should be included in income. However, those checks were deposited into an office account from which income was not reported on his return. Mr. Bailey offers no evidence that such deposits were not made to the account or that deductions were not claimed for the related expenses. We therefore sustain the adjustment.

Likewise, the IRS determined that in 1997 Mr. Bailey received fees of $33,696 that he deposited into an office account from which fees were not included on his return. These unreported fees came from three sources that the agent named, and they were evidenced by canceled checks that were admitted into evidence, in amounts that the agent specified. Mr. Bailey's response is to state that he "cannot divine the source of Respondent's claimed $33,696 'additional income'". Since the source was plainly given, and since Mr. Bailey did not make any showing that these amounts had already been included in income, we sustain the IRS's adjustment.

The IRS determined that in 1998 Mr. Bailey received and deposited into his office account, but did not report on his return, fees and reimbursements from six named payers, in amounts totaling $9,257. Mr. Bailey responds as to only one of the deposits (the largest) and states that it "appears to be" a payment for overhead, i.e., reimbursement of a deductible expense. His implicit position seems to be that since the expense being reimbursed was deductible, then the non-reporting of the corresponding income would be a "wash", with no tax effect (and that including the item in income would in effect deny him a deduction to which he was entitled). That would be true only if he had not in fact claimed on his return a deduction for the overhead expense, which he did not attempt to show (and which seems highly

unlikely).  He makes no response as to the other five items in this group.  The IRS's adjustments must be sustained.

The IRS identified specific checks totaling $7,526 that were deposited to his office account in 2000 but not reported as income.  Mr. Bailey's response is that "The alleged additional income deposited in Petitioner's Office Account is incorrect"; but he cites no evidence and does not explain how or why the determination is incorrect.  We therefore sustain the adjustment.

Also in 2000, checks totaling $38,333, in apparent payment of fees owed to Mr. Bailey by three clients, were deposited to his sister's office account; but the IRS determined that they were not among the amounts in his "Cash Flow Report" that he reported as income.  Mr. Bailey responds:  "The amounts deposited into Nancy Bailey's account was [sic] all transferred to # 1443 [Mr. Bailey's account from which fees were reported], as [t]he records and testimony show, but which Respondent has chosen to ignore."  He cites no such records or testimony, and we are aware of none that contravenes the IRS's analysis.  We sustain the adjustment.

g.    Arithmetic error

The IRS determined that Mr. Bailey had under-reported his 1996 fee income because of a $100,000 mathematical error.  At trial the Commissioner demonstrated the error by showing the total income reported on Schedule C for

Mr. Bailey's law practice ($1,870,209), showing on the workpaper of Mr. Bailey's assistant the component thereof that related to "Fees - Palm BC" (i.e., $386,167.81), and showing a reconstruction of the actual fees, which totals exactly $486,167.81.

Mr. Bailey could have answered this assertion by reconstructing the $386,167.81, or by otherwise showing how the $1.8 million total on the Schedule C accounted for all of the income. He did neither. Rather, in response, he attempted to undermine the reliability of the documents (from his own records) that his assistant gave to the IRS and to propose a different source document for the supposedly correct amount--but without showing how the entries on that document can be reconciled either with his return or with the information previously provided. (On the contrary, the Commissioner demonstrates that Mr. Bailey's different source document substantiates the larger, corrected amount of fees.) The IRS's adjustment is not effectively challenged, and we therefore sustain it.

h.     Speech income

The Schedule C law practice income for 1996 as explained to the IRS by Mr. Bailey's representative included speech income of only $2,000, which the IRS's examining agent thought to be an unusually low amount. The agent

thereafter found in Mr. Bailey's records evidence of speech income totaling $15,700, and the IRS determined additional income in that amount. Mr. Bailey admits that he realized the income, but he asserts that "[t]he $15,700 * * * was indeed duly reported." But this summary assertion is not supported by any analysis of the income reported nor any other evidence. The adjustment is sustained.

For 1998 the agent determined that $20,000 of unreported speech income was deposited into an account of Mrs. Bailey's. Mr. Bailey responds that "[t]he income deposited into Patricia Bailey's account was largely transferred to Petitioner's account #1443 and picked up as income there." He asserts this without any citation of evidence, and his imprecise qualification that the income was "largely" transferred suggests that he has not even tracked the numbers through himself, much less on the record of this case. The adjustment is sustained.

The total income reported on Mr. Bailey's 2000 Schedule C for his "attorney" activity was $325,040. Consistent with that, his Quicken "Cash Flow Report" for 2000 shows income of $269,995 in fees (broken down by client), $16,545 in reimbursements, and $38,500 in "Total Royalty", all totaling $325,040, as reported. However, the IRS found that "royalty" checks had been written to Mr. Bailey not for $38,500 but for $55,000 and $10,000, and it therefore made the

appropriate adjustment for $26,500. Mr. Bailey asserts--without evidence--that "The royalty income was in fact reported"; but he does not explain where in the reported $325,040 those extra royalties might be found. We sustain the adjustment.

The IRS also determined that Mr. Bailey received additional unreported royalty income of $20,000 from West Publishing for 1999. However, the agent notes that Mr. Bailey duly reported royalty income from West Publishing for both 1998 and 1999, paid to Mr. Bailey by a collaborator who received the royalties from the publisher and paid a share to Mr. Bailey. Mr. Bailey contends that those royalties were fully reported. For 1999 the agent adjusted royalty income upward by the amount of a $20,000 payment made not to Mr. Bailey but to someone else, and the theory for attributing it to Mr. Bailey is unclear. In this instance we accept Mr. Bailey's general insistence that he reported all the income that was actually his. This 1999 adjustment is not sustained.

### i. Unreported Boston fees

The Schedule C law practice income for 1996 as explained to the IRS by Mr. Bailey's representative included fees received by the Boston office totaling $1,370,663. The IRS compared this amount to the larger amount of gross receipts appearing on the general ledger for the Boston office, and determined additional

income in the amount of the difference, i.e., $58,374.  Mr. Bailey's response is simply the assertion--without any elaboration or citation of supporting documentation--that "There were no unreported fees from the Boston Office."  The IRS's adjustment is sustained.

### j.        Fees from client McCorkle

The IRS agent made a detailed tracking of fees from Mr. Bailey's client McCorkle into various accounts and onto the returns, but determined that they were reported only in part on the returns, and that $26,713 went unreported in 1997.  In response to this detail, Mr. Bailey simply asserts, without evidentiary support, that the fees were reported.  The adjustment is therefore sustained.

Fees from client McCorkle were again deposited into an account of Mrs. Bailey's in 1998.  The IRS agent again tracked fees between and among the various accounts and onto the returns, but determined that for 1998 $110,000 went unreported.  In response, Mr. Bailey simply asserts, without any citation of the record, "Some McCorkle money was deposited into Patricia's [i.e., his wife's] account, then transferred to Petitioner's # 1443 account and picked up as income, as Petitioner has show in much detail."  The agent's analysis is not at all answered by a showing that "some" of the McCorkle fees were duly reported; but Mr. Bailey

did not make even that modest showing. We cannot tell what he intends by his reference to "much detail". The adjustment is sustained.

### k. Fees from client Vidu

Mr. Bailey admits that in 1998 he received a check of $7,280 from client Vidu in payment of legal fees. However, the check was deposited into an account of Mrs. Bailey's. Mr. Bailey had evidently borrowed money from his wife, and he gave her the check toward that debt. The IRS determined that he had failed to report the income, and adjusted his income upward by that amount. Mr. Bailey asserts that "The Vidu fees were all properly reported"; but he cites no evidence and makes no analysis to support that assertion. The adjustment is therefore sustained.

### l. Fees from client Dubey

The IRS determined that in 2000 Mr. Bailey received from client Dubey fees of $63,473 that he did not report as income. Mr. Bailey admits that he received payment from his client Dubey, but he states--without any citation of evidence--that "all of Subu Dubey's fees were reported--the amount in question was escrowed from 2000 (December) to 2001." If that were true (which he does not show), then he should have reported the income for 2001 (which he also does not show). The adjustment is sustained.

m.      Flow-through from Tel-Share

Tel-Share was an S corporation in which Mr. Bailey had an ownership interest.  For 2000 Tel-Share reported to the IRS that Mr. Bailey's share of its income was $2,423.  He did not report this amount on the appropriate schedule of his 2000 tax return (i.e., on Schedule E), and the agent adjusted his income upward in that amount.  Mr. Bailey's response is to assert that "This transaction(s) was a 'wash'"; but this contention (which he elsewhere uses to deny the includibility in his income of payments Tel-Share made to reimburse expenses paid by his law practice) is simply inapplicable here.  The adjustment is sustained.

n.      Other Duboc-related income

The IRS adjusted Mr. Bailey's 1995 income upward by $106,758, consisting of checks returned to his Credit Suisse account in that year that had been allowed as a deduction in 1994.  Since we have held that Biochem Pharma stock loan proceeds in the Credit Suisse account were not income to Mr. Bailey, and that sale proceeds were not income until transferred from that account to his other accounts, he had no income from that source in 1994, and payments from those proceeds in 1994 were not deductible for him.  Therefore, any amounts paid out from those proceeds in 1994 and returned in 1995 were not income in 1995, and the adjustment is not sustained.

o.    Miscellaneous unreported income

In 1995 Mr. and Mrs. Bailey received a California State income tax refund of $1,469 and interest from three sources totaling $389.  The IRS determined that these amounts were not reported on the Baileys' 1995 Federal income tax return, and Mr. Bailey was unable to show that they were so reported.  We therefore sustain the adjustment.

In 1998 Mr. Bailey received life insurance proceeds of $328,508 from Phoenix Home Life Mutual.  The company reported to Mr. Bailey that $11,288 of the distribution was taxable, but the IRS determined that he had not reported it on his income tax return, and made an adjustment increasing his income.  Mr. Bailey testified that the proceeds "went into Patricia's account.  That was the remnant of the policy we had to cash or borrow heavily against to raise money to get me out of jail.  And, at the time, it was her policy."  However, the report from the company clearly indicates that Mr. Bailey was the payee, and he made no showing that Mrs. Bailey (who did not file a joint return with him for 1998) reported on her own return the taxable portion of the proceeds.  We therefore sustain the adjustment.

An entity called Entertainment Partners reported that it had paid Mr. Bailey wages of $1,541 in 1999, and Principal Life Insurance Company reported that it

had paid him $61 in interest in 1999--neither of which, the IRS determined, was reported on his 1999 return. At trial Mr. Bailey testified, "I don't know offhand what that's about. I guess she [his sister Nancy Bailey] deposited the money in 1999. We're not finding a deposit to cover that. So, my answer is, I don't know what happened to it." We therefore sustain the adjustment.

### p. Favorable income adjustments

The IRS made adjustments to income that were favorable to Mr. Bailey: $1,300 for reimbursed income in 1995; $40,394 for income that was included twice in 1995; and three credits (of $2,426 for income transferred from another account, of $19,600 for corrections to income, and $991 for double-counted interest income) totaling $23,017 in 1996. Mr. Bailey does not object, and we sustain the adjustments.

### 2. Deductions

### a. Dues and publications

The IRS disallowed deductions of $13,383 for 1993 and $10,200 for 1994 that Mr. Bailey claimed for dues and publications. Of the $13,383 disallowed for 1993, $755 is disallowed for lack of substantiation, and $12,628 was nondeductible dues to a private club. Mr. Bailey contends that these were paid in connection with the storing of the Spellbound when it was being held for sale; but

since we find that the yacht activity was not for profit, the payments are nondeductible in any event. Of the $10,200 disallowed for 1994, $200 was disallowed as a political contribution (which Mr. Bailey calls de minimis and does not dispute) and $10,000 was a charitable contribution that the IRS has allowed as a Schedule A deduction. The IRS's adjustments are sustained.

### b. Legal and accounting fees

The IRS disallowed deductions of $2,750 for 1993 and $2,289 for 1994 that Mr. Bailey claimed for legal and accounting fees. The IRS determined that the $2,750 deducted for 1993 and $2,250 of the amount deducted for 2004 was paid for personal tax preparation expenses (which Mr. Bailey disputes but did not disprove) and should therefore be allowed as Schedule A deductions. The IRS disallowed the remaining $39 of the 1994 deduction as a meals and entertainment reduction, which Mr. Bailey did not dispute. The IRS's adjustments are sustained.

### c. Telephone expense

Mr. Bailey claimed a deduction of $22,414 for 1993 for telephone expenses, but the IRS disallowed $1,558 of that amount, determining that $704 was for a cell phone used by Mrs. Bailey and that the remainder was simply unsubstantiated. Mr. Bailey evidently misinterprets the $704 adjustment to be a disallowance of personal toll calls supposedly made from his home office by Mrs. Bailey (which

he denies were made) and he failed to offer substantiation for the remainder. The IRS's disallowance is sustained.

### d.     Tel-Share travel expense

The records that back up Mr. Bailey's tax returns show that, of the $89,765 of travel expenses for which he claimed deductions for 1993, $3,447 was attributable not to Mr. Bailey's business but to Tel-Share, the S corporation in which he had an ownership interest. He explains in his brief that "[a]ny travel conducted for TelShare would have been for the two books of [Mr. Bailey's] that the company published, 'To Be A Trial Lawyer' and 'Lie Detector Man'; this expense is properly deductible, since Petitioner was the author." Assuming that the facts he states were correct, then some but not all of Tel-Share's deduction would have passed through to him. However, he points to no evidence in the record to support this explanation, nor does he show that Tel-Share did not claim these deductions on its own return. The IRS's disallowance is sustained.

### e.     Meals and entertainment

Mr. Bailey's 1993 deduction for "office expenses" of his Boston office included $5,805 for meals and entertainment. Section 274(n) as in effect for 1993 allowed a deduction of only 80 percent of such expenses, so the IRS disallowed 20 percent, or $1,161. Mr. Bailey's brief states that he "believes that the 20%

adjustment had been made".   However, if that were correct, then he should have substantiated $7,256 of meals and entertainment expenses, of which the allowable 80 percent would have been $5,805; but he did not do so.  The IRS's adjustment is sustained.

### f. Schedule E flow-through from BEI

Mr. Bailey reported on his returns flow-through losses from BEI (his S corporation that he merged into Palm Beach Roamer in 1994) in the amounts of $119,103 for 1993 and $138,632 for 1994.  The IRS determined that those losses included expenses of $6,425 for 1993 and $3,850 for 1994 that were not substantiated, so the IRS disallowed the flow-through losses to that extent. Mr. Bailey's response was not to substantiate the expenses but to argue:

> These purport to be Agent Tabor's notes, obviously erased and changed in 2004 (despite the poor copy furnished Petitioner) after the audit turned hostile and Tabor was instructed that P.B. Roamer would be disallowed in its entirety . Tabor offered no testimony to explain this set of circumstances.  The figures on Ex. # 43R [Revenue Agent Tabor's worknotes] and in ¶47 [of the Commissioner's brief] purport to be "adjustments", not unsubstantiated expenses.  These notes should be treated as unreliable.

Again, this contention misallocates the burden of proof, which Mr. Bailey cannot satisfy by assailing the reliability of the agent's work.  Mr. Bailey was obliged to substantiate his losses at trial, but he did not do so.  (The "Adjustment" reflected

in the worknotes was for the amount that was the difference between what was claimed "Per Return" and what the agent was able to establish "Per Audit"--i.e., the amount that was not substantiated.) We sustain the partial disallowance that the IRS made.

### g.    Itemized deductions

For 1993 the IRS disallowed a charitable contribution deduction of $1,000, which Mr. Bailey's brief states (without support from the trial record) "was made at a charitable event at Aventura, a development owned by Don Soffer." Mr. Bailey did not show that the recipient was an organization described in section 170(c)(2), so the disallowance is sustained. For 1993 the IRS also made some adjustments favorable to Mr. Bailey (i.e., allowance of a tax preparation expense of $2,750 as a miscellaneous deduction, and deduction of flow-through expenses to the extent of income from PBR ($5,707)) that we do not disturb.

For 1994 the IRS increased Mr. Bailey's allowable itemized deductions--i.e., the $10,000 additional charitable contribution deduction disallowed as a dues and publications, as explained above, and tax preparation expense of $2,250. Mr. Bailey has no objection, and we sustain the adjustment.

The IRS allowed Mr. Bailey a deduction of $931,698 for 1994 and $302,454 for 1995 for Duboc expenses that he paid from the Credit Suisse account

in those amounts. Mr. Bailey should certainly get the benefit of (and not owe tax on) the funds he expended for that purpose. However, these allowances were premised on the prior upward adjustment to Mr. Bailey's income for the Biochem Pharma stock from the proceeds of which the expenditures were made, which adjustment we did not sustain. Since we have held that Mr. Bailey realized income not from the Credit Suisse account, but only when funds were transferred to his other accounts, such a deduction is no longer appropriate and is not sustained.

For 1996 the IRS determined that Mr. Bailey's documentation substantiated only a portion of his claimed mortgage interest and real estate tax deductions, and it disallowed the remainder--i.e., $14,244 of the mortgage interest and $2,362 of the real estate taxes. He offered no evidence on the subject, and the adjustment is sustained.

For 1997 the IRS disallowed deductions for mortgage interest ($14,986) and real estate taxes ($11,327) that, as for 1996, Mr. Bailey did not substantiate. The adjustments are sustained.

h.     Travel expense

The IRS determined that Mr. Bailey's claimed deduction of 1993 travel expenses included $12,976 that was not substantiated. The trial record includes the IRS agent's worknotes analyzing the subsidiary amounts that made up the total and reporting the supposed comments of Mr. Bailey's daughter-in-law and representative, Lainey Bailey.  In his post-trial brief, Mr. Bailey argues:  "The documents cited by Respondent (l) do not establish the claim, and (2) are incomplete and inaccurate."  However, this argument reflects a misunderstanding of the burden of proof.  In view of the IRS's determination, however fallible, Mr. Bailey was obliged to substantiate his claimed deductions for travel expenses, but he did not do so.  The IRS's adjustment is therefore sustained.

The IRS made adjustments to travel and entertainment expense deductions for 1995 and subsequent years on the basis of an agent's detailed analysis of the travel and entertainment expense that Mr. Bailey claimed for 1996.  She determined the portion of the total claimed (in 1996, $65,272) that was either unsubstantiated or else was for personal travel or other personal expense (in 1996, $22,080).  She then applied that ratio to disallow a portion of the travel and entertainment expense that Mr. Bailey reported for other years--i.e., to disallow $48,199 for 1995, $20,480 for 1997, $45,201 for 1998, and $25,229 for 1999.

(For year 2000 travel expense, see "Office expense" below.)  Of course, the IRS's distinctions between personal and business could be in error; and its use of a ratio from another year, though potentially reasonable, is obviously rough at best and is certainly subject to improvement.  Mr. Bailey therefore had the opportunity to provide that correction and to substantiate all of his claimed deductions, and it was incumbent on him to do so.  He did not.  As to 1996, he summarily asserts, "The 'disallowed' travel and entertainment expenses were properly documented and should be allowed."  As to 1997, he complains that this was "arbitrarily determined".  But Mr. Bailey did not substantiate any of these expenses, and the adjustments are sustained.

### i.    Computers

Mr. Bailey claimed an office expense deduction for 1994 that included $5,457 for the purchase of two computers.  As a general rule, such capital assets are not expensed but depreciated.  Mr. Bailey does not claim any expense deduction therefor under section 179, nor does he show or allege that he elected such treatment.  Rather, he asserts in brief that he "believes that the cost was incurred for rebuilding existing computers with new components".  He does not substantiate this assertion, and it would evidently fail in any event, because deductions are not allowed for "permanent improvements or betterments made to increase the value

of any property".  Sec. 263(a)(1); see also 26 C.F.R. sec. 1.162-4, Income Tax Regs. ("Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall * * * be capitalized and depreciated").  The cost of these computers should have thus been depreciated rather than being fully expensed in 1994.

The IRS determined that the computers were "5-year property" (and therefore depreciated at the rate of $1,091 per year) that had been placed in service in the last quarter of 1994, so that a fourth of that annual amount--$273--was deductible for 1994.  Mr. Bailey argues that "computers in that era went obsolete for business purposes in two years, and the same amount would have been written off over that time," but he did not offer any evidence as to useful life nor any authority that would contradict the IRS's determination.  In fact, his position contradicts the parties' stipulation that he was entitled to an additional $273 in depreciation for 1994.

However, it follows that Mr. Bailey was entitled to depreciation deductions not only for 1994 but also for the years after 1994, until his $5,457 basis in the computers was fully deducted by 1998.  The recomputation of the deficiencies at issue in those subsequent years should therefore take that into account.

### j.    Billed but unpaid expense

Of the $474,097 for which Mr. Bailey claimed a deduction for 1994 for office expenses of his Boston legal practice, the IRS determined that $3,322 constituted expenses that were billed but that he did not actually pay.  Mr. Bailey agrees that he did not pay them, but denies that they were deducted.  However, that denial is not supported by any documentation nor even elaborated by any explanation.  The IRS's adjustment is therefore sustained.

### k.    Contract labor

On his 1995 return Mr. Bailey claimed a deduction of $38,138 for "contract labor" incurred by his Boston office.  The IRS agent determined that the ledger for the business supported only the amount of $36,164 and disallowed the difference of $1,974 as unsubstantiated.  Mr. Bailey offered no evidence to substantiate this amount (or any amount); but in his brief he criticized the agent for erasures on his worknotes and stated, "This entry was made by Hon. Kenneth J . Fishman, then manager of the Boston Office, was doubtless for outside computer services, and should be honored."  It is unclear what "[t]his entry" might refer to.  If Mr. Bailey supposes that there was a $1,974 entry on the return or the ledger that the agent disallowed, then he is evidently mistaken.  In any event, his supposition stated in

his brief is not sufficient to carry his burden of proof, and the adjustment is sustained.

### l. Interest expense

The IRS disallowed $21,594 of interest expense claimed on Mr. Bailey's 1995 return--$15,852 of which was paid to Republic Bank and $5,742 to Credit Suisse. Mr. Bailey did not show that the loan from Credit Suisse was "properly allocable to a trade or business", see sec. 163(h)(2)(A), and the adjustment is sustained. The Republic Bank interest was disallowed because Mr. Bailey's representative told the agent that "it was her belief * * * that this was primarily a personal loan". However, neither the representative nor the agent testified on this subject. The only witness who addressed this subject was Mr. Bailey, who testified credibly to the effect that the interest was paid on a line of credit that he took out to operate his business and on which he drew in 1991 and 1992. The Republic Bank portion of the IRS's adjustment--$15,852--is therefore not sustained.

### m. Expenses double-deducted

The IRS agent disallowed $215,612 of the expenses claimed on Schedule C for Mr. Bailey's West Palm Beach Office for the year 1995 because he determined (as he demonstrated at trial) that these were in effect double-deducted: The

expenses were incurred by a law partnership of which Mr. Bailey was a 50 percent partner, and they were deducted on the return of that partnership (which reported a small net loss), and Mr. Bailey reported his 50 percent share of the loss on his return and thereby obtained the benefit of his 50 percent share of the deductions. However, Mr. Bailey also deducted 50 percent of the partnership's expenses on Schedule C of his own return. In response, Mr. Bailey criticizes the agent's handling of this matter, but he does not contradict the evidence, the reasoning, or the conclusion, so we sustain the adjustment.

### n.     Office expense

Mr. Bailey's Schedule C for 1996 claimed a deduction of $921,857 for Boston office expenses. The IRS agent's workpapers note a discrepancy between this total and the lesser total of $719,775 that was substantiated by the general ledger for the Boston office; and Mr. Bailey did not substantiate any amount greater than this lower amount. The difference between those two amounts is $202,082, which should therefore be the amount of the resulting adjustment; but for reasons we cannot tell (and that the Commissioner on brief does not suggest), the agent made an adjustment of $754,750. We do not understand the detail of Mr. Bailey's argument against this adjustment, but he appears to be correct that it

reflects an "erroneous calculation". We therefore sustain this adjustment only to the extent of $202,082.

Mr. Bailey claimed a 1997 deduction for office expenses of $389,381, but the agent was able to substantiate only $182,897 to his satisfaction, and he therefore disallowed the difference--$206,484. Mr. Bailey argues that "the 'disallowed' office expenses were arbitrarily determined, or from documents neither created nor used by Petitioner, in preparing the 1997 [Form] 1040." But he did not attempt to substantiate an amount greater than IRS allowed, and the adjustment must be sustained.

Mr. Bailey claimed a 1998 deduction for office expenses of $1,109,328, but the agent was able to substantiate only $530,280, and he therefore disallowed the difference--$579,098. Mr. Bailey argues: "The 'disallowed' office expenses were wrongfully cast aside, and were properly documented." But he did not point to any documents that would substantiate an amount greater than the IRS allowed, and the adjustment must be sustained.

Mr. Bailey claimed a 1999 deduction for other office expenses of $753,893, but the agent was able to substantiate only $220,702, and he therefore disallowed the difference--$533,191. Against this adjustment (along with the travel expense adjustment for the same year), Mr. Bailey argues,

> This disallowance is arbitrary, and a further example of an audit that turned into a 'mission' hard on the heels of Judge Horn's preliminary findings in August, 2001 [i.e., Bailey v. United States, 26 Fed. Cl. 187 (2000)]. It should be noted throughout that nearly all of Agent Tabor's adverse reports, conclusions and speculations, the dates of origination (or erasure and modification) are after the above incident had occurred, mostly in 2002 . Why this happened, in an audit that had been running for years, is studiously avoided by Respondent.

For the reasons we explained above in part I.A.3, these allegations of animus do not carry or shift the burden of proof. Mr. Bailey did not point to any documents that would substantiate amounts greater than the IRS allowed, and the adjustments must be sustained.

On Mr. Bailey's Schedule C for 2000, he deducted a single aggregate expense of $940,744. During the audit his representative reconstructed this amount and showed that it included the following: (1) a claimed deduction of $109,870 for travel and entertainment was evidently the representative's 20 percent discount of the total of $127,337 spent as travel and entertainment. The IRS, however, discounted that total by the ratio developed in 1996, allowed only $86,462, and therefore disallowed $23,408. (2) A deduction of $114,798 was claimed for office expenses, but the IRS was able to substantiate only $84,279, so it disallowed $30,519. (3) Nine items totaling $133,421 were also disallowed.

The grand total of these disallowances was $187,348. Once again Mr. Bailey

offered no substantiation at trial, but only the argument that "The disallowed office expenses are arbitrary, and premised once again on Agent Tabor's 'notes'. They should be rejected." However, it was Mr. Bailey's burden to substantiate the amounts and character of the expenses to show them deductible, and he did not do so, so we sustain the adjustments.

### o.     Household maintenance

The IRS's examining agent determined that in 1997 Mr. Bailey received two checks payable from his law practice account, for amounts totaling $24,000, from funds that he did not report as law firm income or elsewhere on his return. In Mr. Bailey's records the checks are coded "Spoonbill Maintenance" (with Spoonbill being a name for Mr. Bailey's house). The agent treated them as personal expenses of Mr. Bailey paid for by the law practice and therefore as income to Mr. Bailey. Mr. Bailey's only opposition to this treatment is the argument that an expenditure for maintenance is, by definition, not an income item. While it is true that the expenditures were not income to the law practice per se, the expenditures made on his behalf and for his benefit were income to him. We therefore sustain the adjustment.

p.      Unexplained items

The IRS disallowed a Schedule C deduction of $16,561 which the agents characterized as "unexplained items".  The items went unexplained at trial, too; and the explanation finally offered in Mr. Bailey's post-trial brief (without citation of any record evidence) is that "[o]f the $16,561 claimed, $10,000 was transferred to a special 006 cost account maintained for Subu Dubey and spent on his case, as the register (Ex. 234-P, p. R-5, date 2/7/2001[)] plainly shows. The balance of $6,561, was transferred to the Office Account as a matter of business routine, and spent in the ordinary course of business."  Even assuming that the cited entry relates to these items, it is not enough to show that they were expended on deductible purposes, if one does not also show (as Mr. Bailey failed to show) that he did not claim deductions for the expenditures when they were subsequently made.  We sustain the adjustment including these items in income.

q.      Hangar expenses

The IRS disputed the deductibility of a few (but not most) of the checks, totaling $6,486, that Mr. Bailey wrote to Chuck Herzberg in 2001, on the grounds that they were either outright personal household expenses ($735) or else expenses of PBR ($5,751).  Similarly, the IRS disallowed, as PBR expenses, $19,469 paid for the hangar originally used by PBR.  By 2001 PBR had discontinued, and the

hangar was used to store Mr. Bailey's business records (a fact confirmed by the IRS agent) and Mr. Herzberg evidently worked in that connection. We therefore sustain the disallowance of household expense but allow the deductions related to the hangar.

### r.    Life insurance premiums

The IRS disallowed a deduction of $19,660 that Mr. Bailey claimed for 2001 for payment of premiums on a life insurance policy on Mr. Bailey's life. In his post-trial brief he explains, "The insurance premiums were for a policy protecting those from whom I had made loans in 1996 to secure Petitioner's freedom from debtor's prison, which were business loans." This explanation lacks any support in the trial record.

### s.    Payment to attorney

The IRS disallowed, as a personal expense, a deduction for Mr. Bailey's payment of $1,150 to an attorney. Mr. Bailey offered no evidence at trial to support the deduction, and the disallowance is sustained.

### t.    Net operating loss carryover

On his 2001 return, Mr. Bailey claimed a net operating loss (NOL) deduction of $71,994, carried forward from claimed losses in prior years that are at

issue here. The recomputation of Mr. Bailey's liability under Rule 155 will show whether there are any losses that could be carried into 2001 or any other year.

VIII. Failure-to-file additions to tax under section 6651(a)(1)

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to file a timely return, unless the taxpayer proves that such failure is due to reasonable cause and is not due to willful neglect. See also United States v. Boyle, 469 U.S. 241, 245 (1985). For 1998, 1999, and 2000, the IRS determined that Mr. Bailey is liable for the addition to tax imposed by section 6651(a)(1) for failure to timely file a return. Mr. Bailey's return for each of those three years was filed about two months late, and this fact satisfies the Commissioner's burden of production under section 7491(c).

The addition to tax applies "unless it is shown that such failure is due to reasonable cause and not due to willful neglect". We find "reasonable cause" as to the 1998 return, on account of Mrs. Bailey's final illness during the time that the return was due in August 1999 and Mr. Bailey's filing of the return 50 days after her death in October 1999. However, Mr. Bailey makes no contention as to "reasonable cause" for the 1999 or 2000 return, and we hold that for those two years he is liable for the addition to tax under section 6651(a)(1).

IX.    <u>Accuracy-related penalty under section 6662</u>

Section 6662(a) and (b)(1) imposes an "accuracy-related penalty" of 20 percent of the portion of the underpayment of tax that is attributable to the taxpayer's negligence or disregard of rules or regulations.[49]   The notices of deficiency determine the penalty for all the years at issue except 1996 and 2001, and we therefore exclude those years from our analysis.  Under section 7491(c), the Commissioner bears the burden of production and must produce sufficient evidence that the imposition of the penalty is appropriate in a given case.  Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect.  Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-447 (2001).

---

[49]Section 6662(a) and (b)(2) also imposes the accuracy-related penalty where the taxpayer's return reflects a "substantial understatement of income tax".  An understatement is substantial if it exceeds the greater of:  (i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $ 5,000.  Sec. 6662(d)(1)(A).  After the parties have recomputed the deficiencies pursuant to Rule 155, we will be able to tell whether Mr. Bailey's returns, in addition to reflecting negligence, also reflected substantial understatements of income tax.

A.     Negligence

For purposes of section 6662, the term "negligence" includes a failure to exercise ordinary and reasonable care in the preparation of a tax return.  26 C.F.R. sec. 1.6662-3(b)(1), Income Tax Regs.  Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Neely v. Commissioner, 85 T.C. 934 (1985).  The term "disregard" includes any careless, reckless, or intentional disregard of the rules or regulations. Sec. 6662(c).  It also "includes any failure by the taxpayer to keep adequate books and records to substantiate items properly."  26 C.F.R. sec. 1.6662-3(b)(1).

By this standard, we find that Mr. Bailey's underpayments for 1993 through 1995 and 1997 through 2000 were negligent.  This is so whether and to the extent that the underpayments result from his failure to report income (whether from Duboc, the payments signed over to Broder, the $100,000 math error, or the other items of unreported income revealed during the audit) or from his claiming of deductions that he did not substantiate or to which he is not entitled.  For most of the items adjusted in the notice of deficiency, he failed to keep records and thereby made the examination of his return a forensic and almost archeological challenge. The examination turned up multiple instances of his depositing income into

multiple accounts in order to frustrate others' potential attempts to seize his funds; but one effect of this strategy was to introduce confusion into his own record-keeping and accounting.

We do not blame Mr. Bailey for failing to anticipate the outcome of his dispute with the Government about the Biochem Pharma proceeds, and had he reported fee income from Mr. Duboc in accordance with his professed theory (i.e., that he was entitled to take money for personal use as fees when earned), then we would not impose the penalty on the income he derived from the Biochem Pharma stock sales (i.e., derived temporarily until he had to repay it). However, he failed to report on any tax return any of the money he drew down from the Biochem Pharma sales. That failure was negligent.

B.    Defenses

A taxpayer who is otherwise liable for the accuracy-related penalty may avoid the liability if he successfully invokes one of the three following provisions:

First, section 6662(d)(2)(B) provides that an understatement may be reduced where the taxpayer had substantial authority for its treatment of any item giving rise to the understatement. There is no authority that would warrant Mr. Bailey's position on any of the disallowed deductions. For the adjustments we have upheld, his factual arguments (that income had been reported or was not received,

or that depreciations had been substantiated) had no evidentiary support. His legal arguments (that his income was not taxable to him when it was paid over to others, whether to cover office-sharing expenses, or to benefit his mother-in-law, or pay off loans, or to repay Duboc funds to the District Court) had no merit.

Second, section 6662(d)(2)(B) provides that an understatement may be reduced where the relevant facts affecting the item's treatment are adequately disclosed on the taxpayer's return and the taxpayer had a reasonable basis for its treatment of that item. Neither of these criteria is met here.

Third, section 6664(c)(1) provides that, if the taxpayer shows, first, that there was reasonable cause for a portion of an underpayment and, second, that he acted in good faith with respect to such portion, then no accuracy-related penalty shall be imposed with respect to that portion. Whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including his efforts to assess his proper tax liability, his knowledge and experience, and the extent to which he relied on the advice of a tax professional. 26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs. If Mr. Bailey had disclosed to a tax professional the facts underlying the adjustments we have sustained, and if the professional had advised him to report the items as he did, then he might have a colorable claim of reasonable cause based on reliance on

advice.  However, Mr. Bailey offered no evidence of such informed advice, nor of any other claim of reasonable cause and good faith.  This defense is therefore unavailing to Mr. Bailey.

<u>Conclusion</u>

The determinations in the IRS's notices of deficiency are sustained in part, as is explained above.  So that the liabilities for the years at issue can be computed,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.